Michael A. Sweet (SBN 184345)
msweet@foxrothschild.com
Dale L. Bratton (SBN 124328)
dbratton@foxrothschild.com
**FOX ROTHSCHILD LLP**
345 California Street, Suite 2200
San Francisco, CA 94104-2670
Telephone:   415.364.5540
Facsimile:    415.391.4436

Attorneys for Debtor
PALM DRIVE HEALTH CARE DISTRICT

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

SANTA ROSA DIVISION

| | |
|---|---|
| In re | Case No.: 14-10510-AJ |
| PALM DRIVE HEALTH CARE DISTRICT, | Chapter 9 |
| Debtor. | **DEBTOR'S STATUS REPORT** |
| | Date:  June 6, 2018<br>Time:  11:00 a.m.<br>Place:  U.S. Bankruptcy Court<br>         99 South E Street<br>         Santa Rosa, CA 95404 |
| | [Telephonic appearances permitted via Court Call] |

In connection with this Court's Order Setting Status Conference and Permitting Telephonic Appearances issued on April 24, 2018 (Dkt. No. 429), Palm Drive Health Care District ("Palm Drive" or "Debtor") submits the status report below. The Debtor reserves supplementing this report orally at the Status Conference.

I.  <u>Brief Recap of History of the Case</u>

1. Prepetition, Palm Drive operated Palm Drive Hospital (the "Hospital"), an acute care hospital in Sebastopol, CA, and provided other health-care related facilities and programs. Palm Drive financed these functions through a combination of medical

services' revenues and a parcel tax of $155 per parcel adopted by the voters in 2004. As a result of a cash crisis in the spring of 2014, Palm Drive filed its petition commencing this bankruptcy case on April 7, 2014. Shortly thereafter, to avoid further cash losses, and operate only consistent with its well-established high standard of medical care and patient safety, Palm Drive closed the Hospital and laid off all but a skeleton administrative staff.

2. To further reduce administrative expense losses, Palm Drive filed motions to reject over [number] of executory contracts with providers of goods and services. These motions resulted in contract payment reductions of over $440,000 per month.

3. After closure of the Hospital, and rejection of executory contracts associated with its operation, Palm Drive turned to efforts to find a framework for reorganizing and re-opening the Hospital. Palm Drive sought to resume the provision of high-quality medical care to residents of the District, with special emphasis on access to emergency room services for residents of this west Sonoma County population.

4. Medical professionals who had been affiliated with the Hospital, together with civic-minded individuals in the community, worked together to achieve re-opening of the Hospital despite Palm Drive's own severe financial straits. The vehicle formed for this purpose was – and is – Sonoma West Medical Center ("SWMC"), a sec. 501(c)(3) nonprofit organization. After extensive discussions and investigations of operational and financial issues, Palm Drive and SWMC entered into a Management Services and Staffing Agreement ("MSA"). Under the MSA, SWMC would re-open and operate the Hospital. SWMC would be responsible for meeting operational expenses, and Palm Drive would not be liable to cover any operating losses that SWMC might experience. Palm Drive's only contribution would be up to $1 million per year for maintenance and required refurbishing of the Hospital facilities – facilities that were to be and still are solely property of Palm Drive. A significant example of facilities restoration requiring funding was state-mandated seismic strengthening, applicable to all hospitals in the state.

5. The structure under which it was hoped to re-open the Hospital shielded Palm Drive from further operating losses, in recognition of Palm Drive's need to appropriately provide for recoveries for its several classes of creditors in bankruptcy. The financial burden of re-opening the Hospital therefore fell on community donors to SWMC. Two District residents in particular provided donated funds in excess of $6 million toward preparing the Hospital facility for re-opening, hiring (in many instances re-hiring) medical and support staff, and improving the Hospital's medical equipment and logistical systems such as electronic medical records. As a result of this organizational and financial effort, the Hospital re-opened in October 2015.

6. In 2015-16 Palm Drive dealt with several large disputed claims. The most significant of these involved asserted Medicare over-reimbursements. After extensive negotiations, Palm Drive achieved a global settlement with HHS, of amounts due from Medicare and owed to Medicare, that resulted in a reduction of HHS's claims by more than $1,400,000. In another significant example, Palm Drive negotiated with a medical equipment lessor –Farnam Street Financial, Inc. – concerning equipment temporarily retained and the lessor's rejection damages claim. A negotiated settlement resulted in a reduction of Farnam's rejection claim by more than $400,000.

7. In 2016 Palm Drive addressed potential preference claims against prepetition creditors. Palm Drive filed 32 preference actions. It also, in an arrangement designed for legal efficiencies, obtained an order of the court permitting more than the usual time frames for formal processes in these actions. The arrangement also encouraged the preference defendants to engage with Palm Drive informally, concerning possible defenses to the preference claims, and potential settlements of amounts not refuted by defendants. This process resulted in a significant number of defendants making an adequate showing of ordinary course defense under bankruptcy law, and accordingly Palm Drive dismissed such actions on that ground. In actions with either insufficient or disputed defenses, Palm Drive was able to obtain settlements with most of the defendants. The gross result has been cash recoveries of over $140,000. In many

3

instances Palm Drive also obtained waiver of bankruptcy claims back under Code Sec. 502(h) that would have reduced the value of these recoveries. Ultimately only one action went further than the complaint and answer stages of litigation – a defendant never responded and a default judgment was obtained.

8. In mid-2016 Palm Drive submitted a proposed plan for adjustment of debts (bankruptcy debt reorganization plan) and related disclosure statement describing that proposed plan. Palm Drive was not, however, able to proceed with the court-approval process for that plan. This was principally because it was asserted that certain bond reserve funds contemplated to be applied to plan distributions were limited to paydown on the bonds with which they were associated; and SWMC experienced financial difficulties that made projections prepared in conjunction with the disclosure statement no longer satisfactory.

9. In 2016 certain residents within the boundaries of three school districts within Palm Drive's territory petitioned the Sonoma County Local Agency Formation Commission ("LAFCO") under state law to detach from Palm Drive. After LAFCO proceedings, the detachment petition was granted and the affected area formally detached from Palm Drive. The effects of detachment are that residents of the affected area no longer vote in Palm Drive elections, and they are not responsible for new debt incurred by Palm Drive after detachment. Residents of the affected area do, however, remain responsible for their pro rata share of the existing debts of Palm Drive (including the unsecured debts included in the bankruptcy case as well as the bond debts). The fiscal result is that these residents continue to pay about 65% of the per parcel amount of parcel tax collected by Palm Drive.

II. Recap of Efforts to Stabilize the Hospital

1. As noted above, the Hospital re-opened in October 2015. SWMC acted, under the MSA, as manager of the Hospital. Members of the community and of the medical staff serve on the governing body of the SWMC. Consistent with state healthcare law, Palm Drive also has members on the governing body.

4

2. This community-based management system encountered financial difficulties. As it resumed its role as the only acute care hospital west of Highway 101 in Sonoma County, it was difficult to rebuild hospital stay bed counts and number of surgical procedures performed. As a result, SWMC sought to subcontract its management role to experienced outside hospital operators. In 2016-17 several such operators were brought in, some on a trial basis, to see if they could bring the Hospital to break-even financial performance. Ultimately, none of these operators were successful in this endeavor.

3. In mid-2017 a different approach was implemented. SWMC was approached by Durall Capital Holdings, a company engaged in the toxicology testing industry. Utilizing features of a federal hospital laboratory outreach program – which permits smaller rural hospitals to serve as reference labs to achieve higher testing volumes and associated revenue – Durall's business plan involved subcontracted management of the Hospital and its lab, while billing for lab tests at higher hospital-based rates as compared with rates reimbursed to free-standing independent laboratories. The increased revenues were shared between SWMC and Durall under the contractual arrangements. Formalized in June 2017, this business plan sharply increased SWMC's monthly operating revenues and allowed SWMC to run in the black for the remainder of 2017.

4. In late 2017, however, Anthem Blue Cross asserted that the SWMC-Durall lab testing arrangement was illegitimate, and that Anthem Blue Cross and its affiliates had been overcharged by $13.5 million through this arrangement. SWMC and Palm Drive strongly disputed these allegations, insisting that the arrangements complied with all applicable legal requirements and produced revenue gains consistent with the federal program purpose of assisting the long-distressed financial stability of smaller rural hospitals.

5. It must be noted that Anthem, although continuing to discuss the substance of the issue with SWMC, has taken no legal action against either SWMC or Palm Drive.

5

Anthem has taken action against Durall in another state (unrelated to SWMC). Perhaps for that reason, Durall has ceased sending specimens for testing at the Hospital lab. This has resulted in SWMC again encountering monthly operating shortfalls.

6. As discussed further below, this development has caused Palm Drive to explore the future of the Hospital on a more fundamental level, possibly by selling the Hospital to an experienced hospital operating company.

7. The Hospital's role during the fall 2017 massive Sonoma County wild fires also deserves mention. As the Tubbs Fire penetrated the city of Santa Rosa, the Sutter and Kaiser hospitals there relocated patients for their safety and continued care. In just five days at the height of this crisis, 544 patients were seen at the Hospital on either an outpatient or inpatient basis, sent from the Santa Rosa facilities because of the fires. Palm Drive's Hospital was a very valuable community resource in this crisis.

III. Palm Drive's Current Financial Condition and Operations

1. At the outset, it is worth noting that despite its long history of financial difficulties, extending back to its inception as a public healthcare district in 2000, Palm Drive has never missed a payment of principal or interest on its secured bond-type indebtedness (2000 GO Bonds; Series 2005 COPs; and Series 2010 COPs). Palm Drive contemplates that this bond indebtedness will be paid in full under a bankruptcy plan, either by continuing the payments contractually required under the current debt instruments or by refinancing with payoff in full upon close of refinancing.

2. Also noteworthy is that – as a California local public agency – Palm Drive regularly posts both its required annual independent financial audits and interim financial statements (as part of board and finance committee meeting minutes) on its website, at www.palmdrivehealthcaredistrict.org Its independently audited financials for 2008 through 2016 are available there. (It should be noted that, for accounting standards reasons, the financials of Palm Drive and SWMC – since June 2015 – are reported as

6

a "Combined Unit" in the audits. That does not affect the independence of Palm Drive from SWMC operating losses.)

    3. Palm Drive operates limited administrative functions, which are necessary to exercise its legal oversight of District activities and programs, and of the Hospital as managed through its hybrid governing body. Palm Drive also funds limited health care and health education programs in the community that are separate from the operation of the Hospital.

    4. Palm Drive itself has therefore become cash positive. A copy of its balance sheet and profit and loss statement as of April 30, 2018, are attached to this report as Exhibit A. This financial statement shows that Palm Drive incurred operating expenses for that month of only $51,485 – down from millions per month prepetition when Palm Drive directly operated the Hospital. As also shown there, Palm Drive has been accumulating a Bankruptcy Reserve, as a basis for a fixed sum to be available for distributions to classes of unsecured creditors under a plan. Palm Drive's reserve currently holds $350,000; an additional amount is held for Palm Drive by the County; the result is a dedicated fund of $700,000 to be available at a plan effective date.

IV. Scenarios, Options, and Constraints Affecting Formulation of a Bankruptcy Exit Plan

    1. To facilitate a definite exit feasibility, Palm Drive has been building a fixed $700,000 bankruptcy reserve, currently on hand and intended to be accumulated in each of the next several years, dedicated to eventual distributions to classes of unsecured creditors.

    2. Palm Drive is current on all bond debt payments, and in an exit plan bond debts will either be unimpaired, i.e. continued payment according to present contractual terms, or refinanced out with payment in full of all principal, interest, and charges.

3. Palm Drive's parcel tax revenue, which is fixed in annual amount, is sufficient to meet its bond debt service, its now modest operating expenses, and the dedicated bankruptcy reserve amount.

4. Palm Drive has per the terms of the MSA been shielded from the operating losses of the Hospital.

5. Palm Drive learned in 2017, however, that its shield from losses of the affiliated Hospital entity raises an IRS issue. Palm Drive is resolved and determined not to expose itself to those operating losses of SWMC. Such non-responsibility for the affiliate's debt, however, implicates an IRS penalty process. That process has a grace period to restore compliance, which is related to the remaining term of outstanding bond debt. Once beyond the grace period, which varies with the maturity of the existing bond issues, Palm Drive must adopt one of several options:

   a. It can refinance at least one of the existing bond issues as taxable debt. This may be practical because interest rates have on the whole been much lower than they were when Palm Drive's bond issues were originated. Palm Drive has engaged financial advisors and bond counsel to explore this option. Results of their efforts are not available as of the date of this report, and are not expected until after the due date of the RFP discussed immediately below.

   b. Alternatively, Palm Drive can divest itself of ownership of the Hospital. To explore that possibility, Palm Drive issued an RFP (request for proposals) in May of this year. The RFP seeks a buyer that would continue operating the facility as an acute care hospital, or at a minimum continue to provide substantial medical services in the facility. Responses to the RFP are due on June 15, 2018. Depending on those responses, it may be necessary to hold discussions and investigations with an interested applicant. It should be noted that sale of the Hospital would require a vote of the residents of the District. That would introduce a contingency that could not be satisfied before either

8

November 2018 or even spring 2019, depending on timing of getting the matter ready to go on the ballot.

    c. If Palm Drive does not divest itself of the Hospital via a sale to a health care operator, then Palm Drive will:

        i. Have to assume responsibility for the financial operating results of the facility, whether as an acute care hospital or some other form of health care operation; or

        ii. Refinance the Series 2000 GO Bonds as a taxable issue, with a concomitant voluntary compliance procedure with the IRS to confirm that the Series 2005 and Series 2010 COPs are not implicated by this nonresponsibility concern, determine what consequences flow from the short period of time that the Hospital was subject to a technically impermissible private use status under its MSA with SWMC, and enter into a compliant management contract with another party; or

        iii. Close the Hospital, liquidate the facility assets including the real property, and rely on the current MSA shield provisions to defend any contention that Palm Drive is liable for any SWMC debts.

V. <u>Forward-Looking Scheduling in this Bankruptcy Case</u>

At the Status Conference, Palm Drive is prepared to address an appropriate timetable for Palm Drive's presentation of a revised bankruptcy plan for adjustment of debts, and related disclosure statement. For the sake of utmost clarity, Palm Drive notes that it is eager to exit bankruptcy. Its struggles to preserve an acute care hospital for west Sonoma County, and formulate a compatible bankruptcy plan, have been challenging. However, Palm Drive has been conserving cash with the goal of holding a dedicated fund for distributions on classes of unsecured claims under a plan. Palm Drive also has in mind flexibility concerning how to reach a plan effective date, which might build in contingencies that would, when satisfied, bring an effective date to fruition.

9

Thus, a definite process might be established even though not all scenarios have presently been completely worked through with the necessary parties.

Date : May 31, 2018

                FOX ROTHSCHILD LLP

                By : *Michael A. Sweet*
                   Michael A. Sweet
                Attorneys for Debtor
                Palm Drive Health Care District

10

Case: 14-10510   Doc# 431   Filed: 05/31/18   Entered: 05/31/18 17:52:39   Page 10 of 10