1  MICHAEL A. SWEET (SBN 184345)
   msweet@foxrothschild.com
2  DALE L. BRATTON (SBN 124328)
   dbratton@foxrothschild.com
3  **FOX ROTHSCHILD LLP**
   345 California Street, Suite 2200
4  San Francisco, CA 94104-2670
   Telephone:    415.364.5540
5  Facsimile:    415.391.4436

6  Attorneys for Debtor
   PALM DRIVE HEALTH CARE DISTRICT
7

8              UNITED STATES BANKRUPTCY COURT

9              NORTHERN DISTRICT OF CALIFORNIA

10                    SANTA ROSA DIVISION

11

12 | In Re:                        | Bk. No. 14-10510-AJ

13 |     PALM DRIVE HEALTH CARE     | Chapter 9
   |     DISTRICT,                  |
14 |                               | Date:  TBD
   |             Debtor.           | Time:  TBD
15 |                               | Place: United States Bankruptcy Court
   |                               |        99 South "E" Street
16 |                               |        Santa Rosa, CA 95404
17 |                               | Judge:   Hon. Charles Novack
18

19               **DISCLOSURE STATEMENT FOR**
20  **PALM DRIVE PLAN FOR ADJUSTMENT OF DEBTS Dated November 19, 2018**
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

Page

I. INTRODUCTION……………………………………………………………… 1

II. EXPLANATION OF CHAPTER 9…………………………………………… 6

III. VOTING PROCEDURES AND CONFIRMATION REQUIREMENTS………….. 8

IV. BACKGROUND OF THE DEBTOR ………………………………………… 18

V. DEVELOPMENTS DURING THIS BANKRUPTCY CASE………………………… 22

VI. DESCRIPTION OF THE PLAN OF ADJUSTMENT OF DEBTS..……………… 31

VII. DESIGNATION OF CLASSES OF CLAIMS AND INTERESTS……………… 32

VIII. TREATMENT OF UNCLASSIFIED CLAIMS ………………………………… 33

IX. TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS …………………… 33

X. EXECUTORY CONTRACTS ………………………………………………… 39

XI. MEANS OF IMPLEMENTATION OF THE PLAN ……………………………… 40

XII. FEASIBILITY OF THE PLAN ……………………………………………… 46

XIII. INJUNCTION AND CUSTODIA LEGIS ……………………………………… 49

XIV. RETAINED JURISDICTION……………………………………………….. 49

XV. EFFECT OF CONFIRMATION OF THE PLAN ………………………………… 50

XVI. NON-SUBSTANTIVE MODIFICATION OF PLAN …………………………… 50

XVII. ALTERNATIVES TO THE PLAN …………………………………………… 50

XVIII. CRAMDOWN REQUESTED………………………………………………….. 52

## ARTICLE I

### INTRODUCTION

Palm Drive Health Care District, a California local health care district ("Palm Drive" or "Debtor"), is the debtor in this case (this "Bankruptcy Case") under the United States Bankruptcy Code. Palm Drive submits this Disclosure Statement in support of the Palm Drive Plan For Adjustment Of Debts Dated November 19, 2018, as it may be amended (the "Plan"), under the provisions of Chapter 9 of the Bankruptcy Code. Palm Drive commenced this Bankruptcy Case voluntarily on April 7, 2014. Approval of the Plan ("confirmation" is the formal terminology) is the culmination of the Chapter 9 process for the adjustment of Palm Drive's debts. Creditors should thoroughly review both this Disclosure Statement and the Plan before deciding whether to accept or reject the Plan.

This Disclosure Statement contains a discussion of the financial condition of Palm Drive and a description of the Plan. This Disclosure Statement sets forth certain information regarding the pre-petition operations and financial history of Palm Drive, events leading to Palm Drive's bankruptcy, significant events that have occurred during the Bankruptcy Case, and the means for implementing a restructuring of Palm Drive's financial affairs. This Disclosure Statement also describes terms and provisions of the Plan, including certain limited alternatives to the Plan, certain effects of confirmation of the Plan, and the manner in which distributions to creditors will be made under the Plan. Additionally, this Disclosure Statement discusses the confirmation process and the voting procedures and requirements for voting on the Plan. Chapter 9 of the Bankruptcy Code incorporates provisions from some other chapters of the Bankruptcy Code, particularly Chapter 11 and so the discussion in this Disclosure Statement will often make reference to sections other than those in Chapter 9.

Palm Drive has devoted great and successful effort to re-opening its hospital (resumed delivering medical services on October 30, 2015) for the benefit of the community, while also providing fair and reasonable treatment for Palm Drive's debts through the Plan. Maintaining medical services to the community is integral to the continued vitality of Palm Drive as a California local health care district. Thus, the Plan's balanced emphasis on restored and continued provision of

medical services, together with an appropriate treatment of creditor claims, is important to Palm Drive's ability to make meaningful distributions to its creditors.

Palm Drive therefore believes that it is in the best interest of all parties that the Plan be confirmed.

### A. Summary of Distributions Under the Plan

The Plan provides treatment for debts owed to seven classes of creditors. Three of these classes are claims of holders of secured bonds: Series 2000 General Obligation Bonds[1] (Class 1), Series 2005 Parcel Tax Revenue Bonds (Class 2), and Series 2010 Certificates of Participation (Class 3).

The Series 2000 GO Bonds must be paid according to their pre-bankruptcy terms, from the ad valorem property tax funds that are raised annually to retire them and not available for any other purpose.

The principal and interest on the Series 2005 Revenue Bonds will be paid in full from parcel tax revenues.

The Series 2010 Certificates of Participation will be paid in full from parcel tax revenues.

Former employees of Palm Drive (Class 4) will receive 60% distribution on Allowed Claims greater than $10,000 in amount, in two payments completed in the first twelve months of the Plan. Claims of former employees that are $10,000 or less fall into Class 6 below, and receive the treatment provided for that class. Former employees with claims greater than $10,000 will have the option to be treated in Class 6, in order to receive a quicker (but lesser) distribution.

General unsecured claims of $250,000 or less (Class 5A) will receive 50% distribution on Allowed Claims, in three installments, with the first installment 90 days from the effective date of the Plan and the subsequent installments in the first and second years after the year of the effective date of the Plan.

General unsecured claims over $250,000 (Class 5B) will receive 75% distribution on Allowed Claims, in seven annual payments after confirmation of the Plan, with the first installment

_____

[1] Capitalized terms have the meanings given for them in Article I of the Plan.

-2-

paid in the second year after the year of the effective date of the Plan and the subsequent six installments paid in the years following the first installment.

A convenience class of smaller claims ($10,000 or less per claim) (Class 6) will receive 40% distribution on Allowed Claims, in one payment within 90 days after the effective date of the Plan.

Unclassified priority claims: Palm Drive believes that there are no allowed priority claims within the meaning of the Bankruptcy Code in this Chapter 9 case, except for allowed administrative expenses of the Bankruptcy Case including allowable Section 503(b)(9) claims, which under the Bankruptcy Code must be paid in full at or near the time of the effective date of the Plan.

**B. Filing of the Bankruptcy Case**

On April 7, 2014, Palm drive filed its voluntary petition under Chapter 9 of the Bankruptcy Code. Palm Drive has continued in possession and control of its assets and activities while in bankruptcy, pursuant to Bankruptcy Code § 904, which limits the scope of the jurisdiction of the Bankruptcy Court in Chapter 9 cases. A Creditors' Committee was appointed on July 11, 2014 (and augmented on July 29, 2014), and has engaged its own legal counsel, Pachulski Stang Ziehl & Jones of San Francisco. An Employees' Committee was appointed on October 30, 2014, and has engaged its own legal counsel, Law Office of David A. Chandler of Santa Rosa.

**C. Purpose of Disclosure Statement**

This Disclosure Statement is submitted for the purpose of soliciting acceptances of the Plan from interested parties entitled to vote on the Plan pursuant to the Bankruptcy Code. Acceptances of the Plan are being sought only from parties that hold claims that are "impaired" (as that term is defined in Bankruptcy Code § 1124) by the Plan and who are receiving or retaining property under the Plan.

Palm Drive has prepared this Disclosure Statement pursuant to Bankruptcy Code § 1125, which requires that a copy of the Plan, or a summary, be submitted to all holders of claims against the Debtor, along with a written disclosure statement containing adequate information about the Debtor of a kind, and in sufficient detail, as far as is reasonably practicable, that would enable a hypothetical, reasonable investor typical of claimholders to make an informed judgment in exercising their right to vote on the Plan.

-3-

This Disclosure Statement was approved by the Bankruptcy Court on _____, 2018. Such approval is required by the Bankruptcy Code before the Disclosure Statement is circulated to creditors in connection with voting on the Plan, and does not constitute a judgment by the Bankruptcy Court as to the desirability of the Plan or the value or suitability of any consideration offered under the Plan. Such approval does indicate, however, that the Bankruptcy Court has determined that the Disclosure Statement meets the requirements of Bankruptcy Code § 1125 and contains adequate information to permit the claimholders whose acceptance of the Plan is solicited to make an informed judgment regarding acceptance or rejection of the Plan.

**THE APPROVAL BY THE BANKRUPTCY COURT OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE PLAN OR A GUARANTEE OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN. THE MATERIAL CONTAINED IN THIS DISCLOSURE STATEMENT IS INTENDED SOLELY FOR THE USE OF CLAIMHOLDERS IN EVALUATING THE PLAN AND VOTING TO ACCEPT OR REJECT THE PLAN AND, ACCORDINGLY, MAY NOT BE RELIED ON FOR ANY PURPOSE OTHER THAN THE DETERMINATION OF HOW TO VOTE ON, OR WHETHER TO OBJECT TO, THE PLAN. THE ADJUSTMENT OF DEBTS OF THE DEBTOR PURSUANT TO THE PLAN IS SUBJECT TO NUMEROUS CONDITIONS AND VARIABLES, AND THERE CAN BE NO ABSOLUTE ASSURANCE THAT THE PLAN, AS CONTEMPLATED, WILL BE EFFECTUATED.**

**DEBTOR PALM DRIVE BELIEVES THAT THE PLAN AND THE PROPOSED TREATMENT OF CLAIMS IS IN THE BEST INTERESTS OF CLAIMHOLDERS, AND THEREFORE URGES YOU TO VOTE TO ACCEPT THE PLAN.**

**THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION, NOR HAS THE S.E.C. PASSED ON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL. THE PLAN SHOULD BE REVIEWED CAREFULLY.**

**NEITHER THE FILING OF THE PLAN NOR ANY STATEMENT OR PROVISION CONTAINED IN THE PLAN OR IN THE DISCLOSURE STATEMENT, NOR THE TAKING BY ANY PARTY IN INTEREST OF ANY ACTION WITH RESPECT TO THE PLAN, SHALL (i) BE OR BE DEEMED TO BE AN ADMISSION AGAINST INTEREST AND (ii) UNTIL THE EFFECTIVE DATE, BE OR BE DEEMED TO BE A WAIVER OF ANY RIGHTS ANY PARTY IN INTEREST MAY HAVE (a) AGAINST ANY OTHER PARTY IN INTEREST OR (b) IN ANY OF THE ASSETS OF ANY OTHER PARTY IN INTEREST, AND, UNTIL THE EFFECTIVE DATE, ALL SUCH RIGHTS ARE SPECIFICALLY RESERVED. IN THE EVENT THAT THE PLAN IS NOT CONFIRMED OR FAILS TO**

-4-

**BECOME EFFECTIVE, NEITHER THE PLAN NOR THE DISCLOSURE STATEMENT, NOR ANY STATEMENT CONTAINED IN THE PLAN OR IN THE DISCLOSURE STATEMENT, MAY BE USED OR RELIED ON IN ANY MANNER IN ANY SUIT, ACTION, PROCEEDING OR CONTROVERSY, IN OR OUT THE DEBTOR'S BANKRUPTCY CASE, INVOLVING THE DEBTOR, EXCEPT WITH RESPECT TO CONFIRMATION OF THE PLAN.**

**D. Hearing on Confirmation of the Plan**

The Bankruptcy Court has set _____, 2018, at ____ _.m., Pacific Time, as the time and date for the hearing to determine whether the Plan has been accepted by creditors holding the requisite number and dollar amount of claims and whether the other requirements for confirmation of the Plan have been satisfied. If the Plan is rejected by one or more impaired classes of claims, the Bankruptcy Court may still confirm the Plan, or a modification thereof, under Bankruptcy Code § 1129(b) (commonly referred to as a "cramdown") if it determines, among other things, that the Plan does not discriminate unfairly and is fair and equitable with respect to the rejecting Class or Classes of Claims impaired under the Plan. The procedures and requirements for voting on the Plan are described in more detail below.

**E. Sources of Information**

Except as otherwise expressly indicated, the portions of this Disclosure Statement describing the Debtor, its functions, properties, and management have been prepared from information furnished by the Debtor, or from public filings and statements made by the Debtor.

Certain of the materials contained in this Disclosure Statement are taken directly from other readily accessible documents or are digests of other documents. While the Debtor has made every effort to retain the meaning of such other documents or portions that have been summarized, the Debtor urges that any reliance on the contents of such other documents should depend on a thorough review of the documents themselves. In the event of a discrepancy between this Disclosure Statement and the actual terms of a document, the actual terms of the document shall govern and apply.

The statements contained in this Disclosure Statement are made as of its date unless another time is specified, and the delivery of this Disclosure Statement shall not, under any circumstances, create an implication that there has been no change in the facts set forth since the date of this

-5-

Disclosure Statement.

**ARTICLE II**
**EXPLANATION OF CHAPTER 9**

**A. Overview of Chapter 9**

Chapter 9 is a special chapter of the Bankruptcy Code provided as a method for the adjustment of debts of local government entities, which includes counties, cities, and special districts such as Palm Drive. Under Chapter 9 a financially distressed public entity seeks to reorganize its financial affairs, for the benefit of the debtor, its creditors, and other interested parties.

In Chapter 9 the debtor local government remains in control and possession of its property and activities. This is consistent with constitutional and Congressional determinations of the proper relations between the units of the U.S. federal system of government, while providing financially distressed local governments with relief when they are insolvent and not able to meet their debts as they come due in the ordinary course.

The filing of a Chapter 9 petition also triggers automatic stays under Bankruptcy Code §§ 362 and 922. These stays, with limited exceptions, halt all attempts to collect pre-petition claims from the debtor or to otherwise interfere with the debtor's activities or property.

The principal purpose of a Chapter 9 case is the formulation and approval of a plan of adjustment for the pre-petition debts of the financially distressed local government. The plan sets forth the treatment of the claims of creditors against the debtor. The plan also provides for the means of implementation of the treatment of creditor claims.

In a Chapter 9 case, only the debtor may file a proposed plan of adjustment of debts. Neither a committee of creditors, any particular creditor, nor any other party in interest may file an alternative or competing plan. In a Chapter 9 case, the Bankruptcy Court is largely limited to ruling on a plan proposed by the debtor. The Bankruptcy Court may not convert a Chapter 9 case to a liquidation under Chapter 7 of the Bankruptcy Code (for federalism reasons), nor may the Bankruptcy Court appoint a trustee to control the affairs of a local public entity that is in a Chapter 9 case. If the Bankruptcy Court declines to approve a plan proposed by the debtor (whether the initial plan or some further amended proposal by the debtor), the Bankruptcy Court's only option is to

-6-

dismiss the bankruptcy case.

**B. Chapter 9 Plan**

After a Chapter 9 plan has been filed with the Bankruptcy Court, and a disclosure statement describing it has been approved for circulation to creditors, the holders of claims against the debtor are permitted to vote on whether to accept or reject the plan. Chapter 9 does not require that each holder of a claim against a debtor vote in favor of a plan for the plan to be confirmed. At a minimum, however, a plan must be accepted by a majority in number and two-thirds in dollar amount of those claims actually voting from at least one class of claims that is impaired under the plan.

Classes of claims that are not "impaired" under a plan are conclusively presumed to have accepted the plan, and therefore are not entitled to vote. A class is "impaired" if the plan modifies the legal, equitable, or contractual rights attaching to the claims of that class. For example, changing the due date of a loan would be impairment of that claim. Modification for purposes of impairment does not include curing defaults and reinstating maturity or payment in full in cash. Conversely, classes of claims that receive or retain no property at all under a plan are conclusively presumed to have rejected the plan, and therefore are also not entitled to vote.

Even if all classes of claims accept a Chapter 9 plan, the Bankruptcy Court may nonetheless decline to confirm it. Bankruptcy Code § 943, and portions of § 1129 incorporated into Chapter 9, set forth the requirements for confirmation and, among other things, require that a plan be in the "best interests" of creditors and that the plan be feasible. For a plan to be determined to be "feasible" generally requires a finding that there is a reasonable probability that the debtor will be able to perform the obligations incurred under the plan and that the debtor will not need further financial reorganization other than as provided under the plan.

The Bankruptcy Court may confirm a Chapter 9 plan even though fewer than all of the classes of impaired claims accept it. The Court may do so under the "cramdown" provisions of Bankruptcy Code Section 1129(b). In order for a plan to be confirmed under the cramdown provisions, despite the rejection of a class of impaired claims, the proponent of the plan must show, among other things, that the plan does not discriminate unfairly and that it is fair and equitable with

-7-

respect to each impaired class of claims or equity interests that has not accepted the plan.

The Bankruptcy Court must further find that the economic terms of the particular plan meet the specific requirements of Bankruptcy Code Section 1129(b) with respect to the objecting class. If the proponent of the plan proposes to seek confirmation of the plan under the provisions of Bankruptcy Code Section 1129(b), the proponent must also meet all applicable requirements of Bankruptcy Code Section 1129(a) (except Section 1129(a)(8) on acceptance by all classes). (Numerous subsections of § 1129(a) do not apply at all in Chapter 9 cases; *see* the listing of those that do in § 901(a).) Those requirements include that (i) the plan comply with applicable Bankruptcy Code provisions and other applicable law, (ii) the plan be proposed in good faith, and (iii) at least one impaired class of creditors has voted to accept the plan.

## ARTICLE III

## VOTING PROCEDURES AND CONFIRMATION REQUIREMENTS

### A. Ballots and Voting Deadline

A ballot for voting to accept or reject the Plan is enclosed with this Disclosure Statement, except for the three classes of creditors whose claims are not impaired by the Plan: Class 1 (Series 2000 GO Bonds), Class 2 (Series 2005 Revenue Bonds), and Class 3 (Series 2010 COPs). After carefully reviewing the Disclosure Statement and Plan, including all exhibits, each interested party entitled to vote should indicate its vote on the enclosed ballot.

The Bankruptcy Court has directed that, in order to be counted for voting purposes, ballots for the acceptance or rejection of the Plan must be received no later than _____, 2018, at 5:00 p.m., Pacific Time (the "Ballot Deadline"), by the bankruptcy attorneys for Palm Drive. Instructions for filling out and submitting your ballot are set forth on the ballot. Please review and follow those instructions carefully.

All interested parties entitled to vote, and desiring to vote, must:

- carefully review the ballot, including the instructions set forth on the ballot;

- sign the ballot; and

- return it to the address indicated on the ballot by the Ballot Deadline for the ballot to be considered.

-8-

**BALLOTS MUST BE <u>RECEIVED</u> NO LATER THAN _____, 2018, AT 5:00 P.M., PACIFIC TIME. ANY BALLOTS RECEIVED AFTER THE BALLOT DEADLINE WILL NOT BE COUNTED. IF YOUR BALLOT IS DAMAGED OR LOST, YOU MAY REQUEST A REPLACEMENT BALLOT BY SENDING A WRITTEN REQUEST TO THE ATTORNEYS FOR THE DEBTOR.**

**Returning the ballot does not constitute filing a proof of claim.**

**B. Claimholders entitled to Vote; Balloting Procedures**

Whether an interested party with a claim that is impaired under the Plan is entitled to vote is subject to certain limitations and conditions. These limitations and conditions are specified in the following subsections.

### 1. <u>Transmission of Ballots to Claimholders</u>

Ballots are being sent to interested parties in accordance with the Federal Rules of Bankruptcy Procedure and the orders of the Bankruptcy Court. Interested parties holding claims that are unimpaired under the Plan are conclusively presumed to have accepted the Plan under Bankruptcy Code § 1126(f), and therefore do not vote concerning the Plan. Classes 1, 2, and 3 will therefore not vote on the Plan.

### 2. **Ballot Tabulation Procedures**

Any timely received ballot that contains sufficient information to permit the identification of the claimant and is cast as an acceptance or rejection of the Plan will be counted and be deemed to be cast as an acceptance or rejection, as the case may be, of the Plan, subject to the following exceptions and clarifications:

(a) If a claim is deemed allowed in accordance with the Plan or the Amended List of Creditors Pursuant to Bankruptcy Code § 924 (("Sec. 924 List") Docket No. 159 filed August 21, 2014) *(i.e.*, is not marked on the Sec. 92 List as disputed, contingent, or unliquidated, and has an amount shown), the claim is allowed for voting purposes in the deemed allowed amount.

(b) If a claim for which a proof of claim has been timely filed is unliquidated, the claim will be temporarily allowed for voting purposes only, and not for purposes of allowance or distribution, for that portion of such claim that is not unliquidated, or, if

-9-

the entire claim is unliquidated, then such claim will be counted for purposes of determining whether a sufficient number of the allowed claims in such class has voted to accept the Plan but the allowed amount of the claim for voting purposes will be $0, subject to the right of such holder to file a motion for temporary allowance;

(c)    If a claim has been estimated or otherwise allowed for voting purposes by order of the Bankruptcy Court, the claim is temporarily allowed in the amount so estimated or allowed by the Court for voting purposes only, and not for purposes of allowance or distribution;

(d)    If a claim is listed in the Sec. 924 List as contingent, unliquidated, or disputed and a proof of claim was (i) not filed by the applicable deadline to file proofs of claim (which was October 8, 2014) or (ii) not deemed timely filed by an order of the Bankruptcy Court prior to the Ballot Deadline, the claim will be disallowed in its entirety for voting purposes;

(e)    For all persons or entities who timely filed a proof of claim reflecting a claim or portion of a claim that is contingent, the claim shall be disallowed in its entirety for voting purposes, subject to the right of such holder to file a motion under the Bankruptcy Rules for temporary allowance;

(f)    If Palm Drive has served and filed an objection to a claim at least thirty (30) days before the hearing on confirmation of the Plan (and such objection is still pending on the date the ballots are due), the claim will be temporarily disallowed for voting purposes only and not for the purposes of the allowance or distribution, except to the extent and in the manner as may be set forth in the objection, including, without limitation, classification as to priority of claim; provided that, if the Bankruptcy Court, on motion filed by the claimant, temporarily allows the claim in a specific amount for the purpose of accepting or rejecting the Plan, the claimant's ballot shall be counted for such amount; such a motion for temporary allowance must be heard and determined by the Bankruptcy Court before the hearing on confirmation of the Plan;

-10-

(g)     If a ballot is otherwise properly completed, executed, and timely filed, but does not indicate an acceptance or rejection of the Plan, or indicates both an acceptance and rejection of the Plan, the ballot will not be counted;

(h)     If a proof of claim has been timely filed and has not been objected to before the hearing on confirmation of the Plan, the voted amount of that claim shall be the liquidated amount specified in the proof of claim;

(i)     If no proof of claim has been timely filed, but a ballot has been submitted with respect to such claim, the voted amount of that claim shall be equal to the amount listed for the particular claim in the Sec. 924 List, to the extent the claim is not listed as contingent, unliquidated, or disputed, and the claim shall be placed in the appropriate class based on Palm Drive's records; and

(j)     If a claim is the subject of an order of the Bankruptcy Court approving a compromise or settlement of that claim, the voted amount of that claim shall be the amount approved by the order of the Bankruptcy Court.

Ballots that fall within the following categories will not be counted or considered for any purpose in determining whether the Plan has been accepted or rejected, except as specified:

(a)     Any ballot received after the Ballot Deadline unless Palm Drive or the Bankruptcy Court shall have granted an extension in writing of the Ballot Deadline with respect to such ballot;

(b)     Any ballot that is illegible or contains insufficient information to permit the identification of the claimant;

(c)     Any ballot cast by a person or entity that does not hold a claim in a class that is entitled to vote to accept or reject the Plan as of the Ballot Deadline;

(d)     Any duplicate ballot will only be counted once;

(e)     Any ballot that is unsigned, or signed by someone other than the holder of the claim (or its authorized representative); or

(f)     At Palm Drive's election, any acceptance or rejection submitted on something other than the ballot form provided by Palm Drive and approved pursuant to the order approving the Disclosure Statement.

(g)     A vote may be disregarded if the Bankruptcy Court determines that the claimholder's acceptance or rejection was not solicited or procured in good faith or in accordance with the applicable provisions of the Bankruptcy Code and the Bankruptcy Rules.

Under Bankruptcy Code Section 1126(f), a class that is not impaired under a plan, and each holder of a claim in such class, are conclusively presumed to have accepted the plan. Under Bankruptcy Code Section 1126(g), a class is deemed not to have accepted a plan if the holders of claims in such class do not receive or retain any property at all under the plan on account of such claims. Holders of claims that are unimpaired under the Plan, or that are not entitled to receive or retain any property under the Plan, are not entitled to vote to accept or reject the Plan.

### 3.  <u>Execution of ballots by Representatives</u>

Federal Rule of Bankruptcy Procedure 3018(c) requires that an acceptance or rejection of a plan shall be in writing, identify the plan accepted or rejected, and be signed by the creditor or an authorized agent. The ballot requires the identification of persons signing in a fiduciary or representative capacity. To be counted, completed ballots signed by trustees, executors, administrators, guardians, attorneys-in-fact, officers of corporations, or others acting in a fiduciary or representative capacity must indicate their capacity when signing. At Palm Drive's request, ballot signatories must submit proper evidence satisfactory to Palm Drive of their authority to so act. Failure to indicate the capacity of the signatory to the ballot may result in the ballot being deemed invalid and not counted.

### 4.  <u>Waivers of Defects and Other Irregularities Regarding Ballots</u>

Unless otherwise directed by the Bankruptcy Court, all questions concerning the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawal of ballots will be determined by Palm Drive in its sole discretion, whose determination will be final and binding. Palm Drive reserves the right to reject any and all ballots not in proper form, the acceptance of which would, in the opinion of Palm Drive or its counsel, be unlawful. Palm Drive further reserves

-12-

the right to waive any defects or irregularities or conditions of delivery as to any particular ballot. Unless waived, any defects or irregularities in connection with deliveries of ballots must be cured within such time as Palm Drive (or the Bankruptcy Court) determines. Neither Palm Drive nor any other person will be under any duty to provide notification of defects or irregularities with respect to deliveries of ballots, nor will any of them incur any liability for failure to provide such notification; provided, however, that Palm Drive will indicate on the ballot summary to the Bankruptcy Court the ballots, if any, that were not counted, and will provide the original of such ballots with the original of the ballot summary at the hearing on confirmation of the Plan. Unless otherwise directed by the Bankruptcy Court, delivery of such ballots will not be deemed to have been made until any irregularities have been cured or waived. Unless otherwise directed by the Bankruptcy Court, ballots previously submitted, and as to which any irregularities have not subsequently been cured or waived, will be invalidated.

## 5. Withdrawal of Ballots and Revocation

Except as otherwise directed by the Bankruptcy Court after notice and a hearing, any holder of a claim (or its authorized representative) in an impaired class who has delivered a valid ballot for the acceptance or rejection of the Plan may withdraw such acceptance or rejection by delivering a written notice of withdrawal to Palm Drive's bankruptcy attorneys at any time before the deadline for voting on the Plan.

To be valid, a notice of withdrawal must:

(a)     contain the description of the claim(s) to which it relates and the aggregate principal amount represented by such claim(s);

(b)     be signed by the claimholder (or its authorized representative) in the same manner as the ballot; and

(c)     be received by Palm Drive's bankruptcy attorneys in a timely manner at the address specified in the ballot instructions for the submission of ballots.

Palm Drive expressly reserves the right to contest the validity of any such withdrawals of ballots.

-13-

Unless otherwise directed by the Bankruptcy Court, a purported notice of withdrawal of ballots that is not received in a timely manner by Palm Drive's bankruptcy attorneys will not be effective to withdraw a previously submitted ballot.

Any holder of a claim (or its authorized representative) who has previously submitted a properly completed ballot before the Ballot Deadline may revoke such ballot and change its vote by submitting before the Ballot Deadline a subsequent, properly completed ballot for acceptance or rejection of the Plan. In addition, if a holder of a claim submits a valid notice of withdrawal prior to the deadline for voting on the Plan, such holder may submit a new ballot, and such ballot will be counted so long as it is received prior to the Ballot Deadline.

Palm Drive believes that the above proposed procedures provide for a fair and equitable voting process, that is consistent with applicable law and rules.

### C. Bar Date for Filing Proofs of Claim Has Passed

The Bankruptcy Court, by order of the court, established October 8, 2014, as the deadline for filing proofs of claim in the Bankruptcy Case, by private parties and governmental entities. Unless otherwise ordered by the Bankruptcy Court on motion to the court, late-filed claims will be disregarded for voting and distribution purposes.

### D. Definition of Impairment

Under Bankruptcy Code Section 1124, a class of claims is impaired under a plan unless, with respect to each claim in that class, the Plan:

1) leaves unaltered the legal, equitable, and contractual rights of the holder of such claim or equity interest; or

2) notwithstanding any contractual provision or applicable law that entitles the holder of a claim or equity interest to receive accelerated payment of such claim or equity interest after the occurrence of a default:

(a) cures any such default that occurred before or after the commencement of the case under the Bankruptcy Code, other than a default of a kind specified in Bankruptcy Code Section 365(b)(2);

-14-

(b) reinstates the maturity of such claim or equity interest as it existed before the default;

(c) compensates the holder of such claim or equity interest for damages incurred as a result of reasonable reliance on such contractual provision or applicable law; and

(d) does not otherwise alter the legal, equitable, or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

**E.  Classes Impaired Under the Plan; and Those Not Impaired**

Claims in Classes 4, 5A, 5B, and 6 are impaired under the Plan.  Therefore, holders of claims in those classes are eligible to vote to accept or reject the Plan.

Claims in Class 1, 2, and 3 are unimpaired under the Plan, and therefore holders of those claims are conclusively presumed to have accepted the Plan pursuant to Bankruptcy Code § 1126(f). Accordingly, Palm Drive is not soliciting votes from holders of claims in Classes 1, 2, and 3.

There are no classes of claims that receive nothing under the Plan, and therefore no class that is conclusively presumed to reject the Plan pursuant to Bankruptcy Code § 1126(g).

**F.  Vote Required for Class Acceptance**

The Bankruptcy Code defines acceptance of a plan by a class of creditors as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of the claims of that class that actually cast ballots for acceptance or rejection of the Plan; that is, acceptance by a class takes place only if creditors holding claims constituting at least two-thirds in dollar amount of the total amount of claims and more than one-half in number of the creditors actually voting in that class cast their ballots in favor of acceptance.

**G.  Confirmation of the Plan**

**1.    Solicitation of Acceptances**

Palm Drive as debtor is soliciting your vote in favor of acceptance of the Plan.

-15-

**NO REPRESENTATIONS OR ASSURANCES, IF ANY, CONCERNING THE DEBTOR OR THE PLAN ARE AUTHORIZED BY THE DEBTOR, OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. THIS IS A SOLICITATION SOLELY BY THE DEBTOR, AND IS NOT A SOLICITATION BY ANY DIRECTOR, OFFICER, ATTORNEY, ACCOUNTANT, OR OTHER PROFESSIONAL FOR THE DEBTOR.**

**THE REPRESENTATIONS, IF ANY, MADE IN THIS DISCLOSURE STATEMENT ARE THOSE OF THE DEBTOR AND NOT OF SUCH DIRECTOR, OFFICER, ATTORNEYS, ACCOUNTANTS, OR OTHER PROFESSIONALS, EXCEPT AS MAY BE OTHERWISE SPECIFICALLY AND EXPRESSLY INDICATED.**

Under the Bankruptcy Code, a vote for acceptance or rejection of a plan may not be solicited unless the claimant has received a copy of a disclosure statement approved by the Bankruptcy Court prior to, or concurrently with, such solicitation. This solicitation of votes on the Plan is governed by Bankruptcy Code Section 1125(b). Violation of Bankruptcy Code Section 1125(b) may result in sanctions by the Bankruptcy Court, including disallowance of any improperly solicited vote.

### 2.     Requirements for Confirmation of the Plan

At the hearing on confirmation of the Plan, the Bankruptcy Court will determine whether the requirements of Bankruptcy Code § 1129 (to the extent applicable in Chapter 9) and § 943 have been satisfied, in which event the Bankruptcy Court will enter an order confirming the Plan. The confirmation requirements are to a significant extent technical in nature under the Bankruptcy Code, and creditors and other parties in interest may wish to seek advice from knowledgeable bankruptcy counsel about the statutory requirements for confirmation.

Palm Drive believes that the Plan satisfies all of the statutory requirements of the Bankruptcy Code for confirmation of a plan under Chapter 9 and that the Plan is proposed in good faith. Palm Drive believes it has complied, or will have complied, with all the requirements of the Bankruptcy Code governing confirmation of the Plan.

### 3.     Acceptances Necessary to Confirm the Plan

Voting on the Plan by each holder of a claim (or its authorized representative) is important. The Bankruptcy Code does not require that each holder of a claim vote in favor of the Plan in order

-16-

for the Court to confirm the Plan. Generally, to be confirmed under the acceptance provisions of Bankruptcy Code § 1126(a), the Plan must be accepted by each class of claims that is impaired under the Plan by parties holding at least two-thirds in dollar amount and more than one-half in number of the allowed claims of such class actually voting in connection with the Plan, except as noted with respect to cramdown below. Even if all classes of claims accept the Plan, the Bankruptcy Court may decline to confirm the Plan on grounds other than creditor voting.

### 4. Cramdown

In the event that any impaired class of claims does not accept the Plan, the Bankruptcy Court may still confirm the Plan at the Palm Drive's request if, as to each impaired class that has not accepted the Plan, the Plan "does not discriminate unfairly" and is "fair and equitable." A plan does not discriminate unfairly within the meaning of the Bankruptcy Code if no class receives more than another class of equal legal priority without reasonable justification for the different treatment. "Fair and equitable" has different meanings for holders of secured and unsecured claims and equity interests.

With respect to a secured claim, "fair and equitable" means either (i) the impaired secured creditor retains its liens to the extent of its allowed claim and receives deferred cash payments at least equal to the allowed amount of its claims with a present value as of the effective date of the plan at least equal to the value of such creditor's interest in the property securing its liens; (ii) property subject to the lien of the impaired secured creditor is sold free and clear of that lien, with that lien attaching to the proceeds of sale, and such lien proceeds must be treated in accordance with clauses (i) and (iii) hereof [this sub-provision is inapplicable in Palm Drive's circumstances] or (iii) the impaired secured creditor realizes the "indubitable equivalent" of its claim under the plan.

With respect to an unsecured claim, "fair and equitable" means either (i) each impaired creditor receives or retains property of a value equal to the amount of its allowed claim or (ii) the holders of claims that are junior to the claims of the dissenting class will not receive any property under the plan.

Palm Drive believes that the Plan does not discriminate unfairly and is fair and equitable with respect to each impaired class of claims. In the event at least one class of impaired claims rejects or

-17-

is deemed to have rejected the Plan, the Bankruptcy Court will determine at the hearing on confirmation whether the Plan is fair and equitable and does not discriminate unfairly against any rejecting impaired class of claims.

## ARTICLE IV

## BACKGROUND OF THE DEBTOR

### A.  Description of Palm Drive

Palm Drive is a local health care district organized under the provisions of the California Health and Safety Code.  Its territory embraces a region of western Sonoma County, including the community of Sebastopol (where its hospital is located), and stretches from near Santa Rosa in the East to Bodega Bay in the West.  The district has a population of approximately 50,000 persons.  It is governed by a five-member Board of Directors elected by registered voters in the district.

Palm Drive Hospital had been operated by a commercial operator, Columbia/HCA, but in December 1998 Columbia/HCA gave notice of intent to cease operating the Hospital.  Community organizing and fund raising efforts succeeded in keeping the Hospital open while longer-term arrangements for its operation were formulated.  As a result of a public election in the territory of the district, the health care district was officially formed on April 25, 2000, and issued $5,900,000 in general obligation bonds *(i.e.*, the Series 2000 GO Bonds).  $3.5 million of proceeds of the Series 2000 GO Bonds was used to complete the purchase of the Hospital facility.  The balance of the bond proceeds were used to fund improvements to the Hospital facility and as capitalization for the new district.  The district took over full operation of the Hospital on November 1, 2001.  The Series 2000 GO Bonds are repaid through an amount of property tax (ad valorem tax) raised each year in the district matched to the debt service on the Bonds for that year.

### B.  2004-2005 Bond Financing

In 2004 Palm Drive's Board of Directors determined that further financial support was needed beyond the operating revenues generated by the Hospital and other medical services programs runs by the district.  Palm Drive therefore placed Measure W on the November ballot in 2004.  Measure W provided for a parcel tax on real property in the district, for the purpose of assuring the continued operation of the Hospital and provide continuing access to local emergency

-18-

care, acute care, and other medical and physician services. Measure W received more than the 2/3 minimum vote of residents of the district required under state law to establish this special tax, and the parcel tax in the annual amount of $155 per eligible parcel was instituted. (There are exemptions for certain low-value parcels, and single tax for certain contiguous parcels.)

Palm Drive then partially monetized the parcel tax revenue stream, by issuing revenue bonds in the aggregate amount of $9,800,000 (i.e., the Series 2005 Revenue Bonds). These bonds were issued in April 2005. The proceeds of the Series 2005 Revenue Bonds were devoted to capital expenditures and operating expenses of the district. The debt service on the Series 2005 Revenue Bonds is payable from the parcel tax revenues. The annual receipts from the parcel tax exceed the amount required to meet debt service on the Series 2005 Revenue Bonds, and the revenues above that threshold (subject to certain conditions) ("unrestricted parcel tax revenues") are available to Palm Drive for its capital and operating expenditures. The obligation of the Series 2005 Revenue Bonds is a lien on the parcel tax revenues.

### C. First Chapter 9 Bankruptcy Case

Despite the financial lift provided by the 2004-2005 bond financing, Palm Drive struggled to meet its expenses from the combination of operating revenues and unrestricted parcel tax revenues. Like many small and rural hospital districts, Palm Drive has for years confronted unfavorable trends in the sources of payment for its medical services, those services being primarily government and private insurance reimbursement programs. As a small hospital Palm Drive had less negotiating leverage with private insurers than other hospitals in Sonoma County and consequently obtained lower reimbursement rates. Government programs have imposed mandatory payment reductions, while also increasing regulatory requirements. Under federal law a hospital is required to treat any person admitted to a hospital emergency room whether or not the person is able to pay for services. Many emergency room patients were Medi-Cal or Medicare eligible but did not cooperate sufficiently with the governmental paying authorities to obtain or maintain benefits, and Palm Drive was not reimbursed for the services provided. Palm Drive's hospital dates from 1976, and it faced deferred maintenance needs, as well as increased regulatory mandates such as seismic retrofitting on a multi-year schedule that has still not run its course.

-19-

By late winter 2006 and early spring of 2007, Palm Drive faced a serious cash shortfall. Palm Drive recognized that, even with an incoming infusion of annual parcel tax revenue in April, a thorough reorganization of its finances and operations was needed. Accordingly, on April 5, 2007, Palm Drive filed a petition in bankruptcy under Chapter 9 of the Bankruptcy Code (the "First Chapter 9 Case"). During the First Chapter 9 Case, with the support of loans from community members, a local bank, and Sonoma County, Palm Drive was able to keep the Hospital open. Palm Drive also remained current on its bond debt obligations. At the same time, Palm Drive developed a bankruptcy plan for payment of its other secured creditors in full, and an acceptable treatment of its unsecured creditors, and restructuring its operations going forward. General unsecured creditors were paid 55% on their claims under the plan of adjustment of debts approved in the First Chapter 9 Case.

To repay the short-term borrowings made during the First Chapter 9 Case, and meet the payments to creditors other than bondholders, designated for payment in a short time frame (with the perspective of time, probably in an overly short time frame for Palm Drive's financial stability), Palm Drive was to issue Certificates of Participation secured by the parcel tax revenue stream (i.e., the Series 2010 COPs) in the aggregate amount of $11,000,000. The plan of adjustment of debts in the First Chapter 9 case was approved by the Bankruptcy Court, subject to successful issuance of the Series 2010 COPs. This was accomplished.

The proceeds of the Series 2010 COPs were used to make the repayments and distributions required under the plan, make certain improvements and equipment purchases for the Hospital facilities, provide working capital for Palm Drive's operations, and fund a required reserve of approximately $1,000,000 for the holders of the Series 2010 COPs. Palm Drive made all payments to creditors required under the terms of the bankruptcy plan of the First Chapter 9 Case.

Debt service on the Series 2010 COPs, combined with debt service on the earlier Series 2005 Revenue Bonds, still did not consume all of the annual parcel tax revenues (and was designed not to), and unrestricted parcel tax revenues – although then at a significantly reduced level – continued to be available as additional operating revenues.

### D. Second Chapter 9 Case

After completing the First Chapter 9 Case, Palm Drive responsibly and proactively managed its limited finances to operate the Hospital, despite a sustained reduction in patient volume and venue. Uncontrollable cost inflationary pressures combined with volume and reimbursement declines created ongoing operating deficits. The proceeds of the Series 2010 COPs devoted to working capital, above the payments required under the plan of adjustment from the First Chapter 9 Case, helped to manage the operating deficit for several years. By the spring of 2014, however, the cushion of those funds had been depleted.

Palm Drive had maintained an enviable record of operating the Hospital with high quality of care and patient safety. In March 2014 *Consumer Reports* released the results of a survey it conducted of more than 2,500 hospitals nationwide. Palm Drive Hospital was rated No. 5 *nationally* in this survey. Nevertheless, Palm Drive's financial struggles caused its Board and management to become concerned about maintaining its high standard of care in light of increasing fiscal pressures. Palm Drive accordingly obtained input from a nationally recognized healthcare consulting firm. Together the consultants and the Board explored options and models for changes in services and operations that could continue to serve the inpatient and emergency care needs of the residents of Palm Drive's territory within Palm Drive's financial limitations. This evaluation reached the conclusion that financial viability was not reasonably possible without major restructuring that could not be completed before cash flow problems overwhelmed the district.

Palm Drive prioritized patient care and safety, and recognized that its insolvency and projected continued declines in patient volume and revenue could not sustain operations in the near-term. Management therefore recommended to the Board of Directors the termination of inpatient acute care services and closure of the emergency room. Responding to this imminent fiscal crisis, Palm Drive determined that it would not be able to meet its cash obligations during the following 60 days and accordingly declared a fiscal emergency under applicable California law. These determinations were made – as required by law – after taking public comment after a noticed public hearing on Palm Drive's circumstances, and adopting a Board resolution on April 1, 2014, declaring that the financial state of the district jeopardized the health, safety, or well-being of the residents of

-21-

the district without invoking the protection of Chapter 9 of the Bankruptcy Code. The Board therefore authorized management to proceed with filing this second case under Chapter 9.

On April 7, 2014, Palm Drive filed its petition commencing this Bankruptcy Case.

# ARTICLE V

# DEVELOPMENTS DURING THIS BANKRUPTCY CASE

## A. Suspension of Operations; Cost Cutting

Before and after filing its bankruptcy petition, Palm Drive undertook immediate steps to reduce its negative cash flow. Employees were terminated in an orderly manner, and medical operations wound down in a careful and safe manner. The Hospital suspended operations on April 28, 2014. Closure of the Hospital was widely publicized throughout the district. Nevertheless, after closure of the Hospital, an ambulance service was retained to stand by at the Hospital premises for several months to meet and serve any patients who arrived still expecting the emergency room to be open. This standby service was terminated only after a significant period had elapsed when no patients had arrived with such lack of knowledge.

After the suspension of Hospital operations, Palm Drive staff was reduced largely to a skeletal administrative staff. For example, some accounting staff was retained for several months to continue the collection of accounts receivable for services previously rendered, from governmental and private insurance sources and individual patients.

Consistent with the automatic stay of collection actions provided by the bankruptcy filing, most vendor payments ceased after the petition date. Some medical equipment lease payments continued to be made while Palm Drive considered whether such significant equipment items might be needed for a possible re-opening of the Hospital after a reorganization of Palm Drive's operations.

Palm Drive's unrestricted parcel tax revenues become available at three times during each year, in April, June, and December. By far the largest part of these tax revenues is received in December. Thus, in mid-2014, Palm Drive – having suspended hospital operations, which cut losses but also cut revenue from providing services – was in need of interim financial support to enable its orderly wind down of operations and staffing. This assistance was provided in the form of a loan

-22-

from Sonoma County, in the amount of $1,200,000, with the approval of the Bankruptcy Court. As tax revenues became available, and as required by the loan terms and state law applicable to the County's ability to make short-term lending available, the loan from the County was repaid in full by January 31, 2015.

### B.  Contract Rejections

A substantial portion of Palm Drive's operations had been done under supplier contracts (medical supplies, administrative support, etc.) and equipment leases (esp. major medical equipment).  To reduce its negative cash flow, as permitted by applicable bankruptcy law, Palm Drive applied to the Bankruptcy Court for rejection of many of these contracts.  With Court approval, over 200 contracts and leases were rejected.  The other parties to these agreements have claims in the Bankruptcy Case for (valid) unpaid amounts on the remaining term of the agreements, but those claims will be paid only a percentage return, on a pro rata basis along with other general unsecured claims in the Bankruptcy Case.  On an immediate basis, Palm Drive was freed from continuing to make current payments under these agreements.  The result was a further reduction in Palm Drive's cash outflow by several hundred thousand dollars.

### C.  Negotiation of Reductions in Certain Large Claims

During this Bankruptcy Case, Palm Drive put an emphasis on the amount and validity of certain of the largest claims asserted in the case.  Through analysis of the bases for the claims, and negotiation with their holders concerning some disputable elements, significant reductions in the amount of several large claims have been agreed upon.  Because these claims would have received only a percentage distribution under the Plan, the savings from these reductions are not the full amount of the reductions.  The reductions nevertheless are very substantial and contribute to Palm Drive's ability to provide the treatment of allowed claims provided for under the Plan.  The claim reductions to date amount to over $2,600,000, from approximately $13,000,000 of general unsecured claims filed or scheduled in the Bankruptcy Case.  Some examples of these claim compromises follow.

Marin General Hospital had claims for administrative services provided to Palm Drive under a management support agreement.  After negotiations over these claims, a settlement agreement was

-23-

reached, and approved by an order of the Bankruptcy Court. As a result, MGH withdrew its claim filed for $432,850.

Farnam Street Financial, Inc., was an equipment lessor to Palm Drive. Palm Drive rejected the equipment lease. By interim agreement some of the leased equipment was returned to Farnam, some was purchased by Sonoma West Medical Center (discussed below) for use in the re-opened hospital, and Palm Drive made some reduced interim payments while it retained equipment subsequently purchased by SWMC. Meanwhile Farnam filed a proof of claim in the Bankruptcy Case for $1,484,709. Palm Drive disagreed with some elements and calculation of this claim, and after negotiations a settlement agreement was reached under which Farnam reduced its claim by $418,541. This settlement was approved by the Bankruptcy Court after a motion on appropriate notice.

Innovasis was a supplier to Palm Drive of medical devices used in orthopedic surgeries. Innovasis filed a claim in the Bankruptcy Case for unpaid supplies in the amount of $1,686,543. Palm Drive disagreed with the calculation and value of some elements of this claim. After negotiations, a settlement was agreed. Under the terms, Innovasis reduced its claim by $250,000 and Palm Drive waived a potential claim against Innovasis of approximately $115,000. The Bankruptcy Court approved this settlement.

The Centers for Medicare & Medicaid Services of the U.S. Dept. of Health and Human Services (CMS) is the governmental agency responsible for reimbursing medical providers such as Palm Drive for services provided to eligible patients, as well as monitoring the program for over- and under-payments after reconciliation of accounts. CMS pays reimbursements on a rolling basis, with relatively prompt payment on initial submissions by healthcare providers but with a right to audit the submissions for correct category coding and eligibility under the program. CMS also is responsible for administering certain grant programs under which healthcare providers can receive additional funds for certain prioritized purposes, but – again – audits the use of funds for consistency with the program eligibility and purposes.

CMS asserted claims against Palm Drive in the aggregate amount of $1,828,897. Over $1,000,000 of this arose from Palm Drive's participation in an electronic health records incentive

-24-

program that CMS asserted Palm Drive had not established that it applied funds it received for the eligible program purposes. Palm Drive believed that it had, but had only failed for understandable reasons related to its bankruptcy to fully avail itself of administrative appeals. After lengthy discussions with CMS, which has been generally supportive of Palm Drive as a community health care provider, a settlement of outstanding CMS claims was agreed upon. Under the terms of the settlement, CMS reduced its claims against Palm Drive to $322,671, a reduction of over $1,500,000.

The claim of CMS has a favored status in comparison with some other types of claims, functionally similar to a secured claim. This is because CMS continues to make payments to Palm Drive as Palm Drive continues the provision of medical services. Under applicable healthcare and bankruptcy case law, CMS could have the right to recover the amount owed to it from current reimbursements otherwise coming to Palm Drive. This would have been a serious cash flow detriment to Palm Drive as its re-opened hospital provided services and sought reimbursements for them. CMS recognized that, and agreed to receive the settlement amount owed to it in installments payable over a period of five years.

The settlement with CMS was documented in a final agreement, and approved by the Bankruptcy Court after a motion on appropriate notice. Payments already made have reduced the amount due, and remaining payments continue to be made regularly per the terms of the settlement.

The efforts described above are the results of Palm Drive's focus on resolving disputed or uncertain aspects of certain of the largest claims in the Bankruptcy Case. Nevertheless, analysis of other claims among the more than 600 claims scheduled and filed in the Bankruptcy Case continues. Palm Drive reserves all rights to object to any of those claims, before or after confirmation of the Plan, as to their validity, amount, proper classification, or any other basis available under bankruptcy law. Palm Drive anticipates that there will be objections to some claims. By way of examples only, there are claims that are clearly filed as secured when they are not, or priority status when they are not.

### D. Preference Recoveries

Under applicable bankruptcy law, a debtor in bankruptcy has the possibility of recovering certain payments made to creditors during the last 90 days prior to the filing of the bankruptcy

-25-

petition.  These potential recoveries – "preference claims" – are provided by Congressional policy to reduce the incentive for creditors to seek to accelerate the deterioration of a struggling entity as it attempts to avoid insolvency proceedings.

Palm Drive identified 33 preference claims large enough to be worth pursuing.  Palm Drive filed formal lawsuits seeking to recover on these claims, but then also – with the approval of the Bankruptcy Court – provided for an informal process of discussion and negotiation with the parties from whom recoveries were sought.  After evaluating information provided by these parties related to defenses available under bankruptcy law, the strength of the defenses, and the potential legal expense of pursuing the claims, Palm Drive was able to resolve all of the claims with minimal formal activity.  Palm Drive recovered in the aggregate over $140,000 on the preference claims.

### E.  Exploration of Medical Services Options; Development of Operations Program

After operation of the Hospital was suspended in April of 2014, Palm Drive undertook a variety of efforts to explore its options for resuming active provision of medical services to the residents of the district.  These efforts included "listening sessions" held throughout the district to sample public opinion on the desirability of resuming operation of the Hospital with acute care services and an ER, and/or other types of medical services such as urgent care centers.  Palm Drive also invited, via Request for Proposals (RFP's), interested medical provider organizations to submit proposals for possible collaborative or contract arrangements with Palm Drive for resumption of hospital or other medical services in the district.  In general, the weight of public comment was in the direction of re-opening the Hospital as an essential medical resource in the western Sonoma County area.

From an early date, a party actively interested in working with Palm Drive, particularly with the goal of achieving re-opening of the Hospital, was the Palm Drive Health Care Foundation (the "Foundation").  (The Foundation adopted that name in 2003.)  The Foundation has a long history, extending back to before the District was formed in 2000.  The Foundation and Palm Drive began discussion immediately in April 2014 about a possible cooperative effort that could lead to re-opening the Hospital.  Extended discussions and analysis of operational and financial issues ensued.

Case: 14-10510    Doc# 446    Filed: 11/19/18    Entered: 11/19/18 16:14:37    Page 28 of 58

By October 2014 Palm Drive had determined that the Foundation's proposal was more promising than any alternative. Palm Drive's Board therefore formally selected the Foundation's proposal as its preferred means of seeking to re-open the Hospital, and directed management to continue discussions with the Foundation, with the goal of defining a firm and workable framework for re-opening the Hospital.

A group of civic-minded individuals, spear-headed by the leadership of the Foundation, came together to work with the Palm Drive Board on a specific framework for re-opening the Hospital. This group recognized that re-opening the Hospital would require a substantial component of community-sourced funding, and actively sought civic-minded donors who could make the necessary commitment. After further months of intensive discussions and analysis, a framework was articulated that would permit re-opening the Hospital. That framework combined elements of an operational model, a financial structure for the re-start transitional funding, and the governance requirements for public health care districts.

### F. MSSA and Re-Opening Hospital; SWMC Operating Experience

The framework that resulted from these efforts provided for operation of the Hospital by a new, non-profit entity (a California public benefit corporation) called Sonoma West Medical Center ("SWMC"). This framework was the subject of several public meetings of the Palm Drive Board, at which public comment was taken. The framework was then reduced to a formal agreement between Palm Drive and SWMC. This agreement was the Management Services and Staffing Agreement ("MSSA"), a copy of which is available at Palm Drive's website at http://palmdrivehealthcaredistrict.org/wp-content/uploads/2015/07/MSA.pdf  The MSSA was approved by the Palm Drive Board on March 17, 2015.

Under terms of the MSSA, SWMC operated the Hospital, under the overall supervision of a Hospital Governing Board that operates as a subcommittee of the Palm Drive Board of Directors. The Hospital Governing Board is structured to have a mix of members from the District Board, the public, and medical staff. This formal structure has been employed in some other California public health care districts and is consistent with state local health care district law.

-27-

SWMC, as part of its management duties to the Hospital Governing Board, took responsibility for taking most of the steps necessary for re-opening the Hospital. These steps included obtaining necessary regulatory inspections and approvals, hiring appropriate medical and support staff, refurbishing some areas of the hospital facilities, and acquiring some necessary additional or replacement equipment, services, and software systems.

SWMC was responsible for raising the major share of the funds incident to re-opening the Hospital. Ultimately, these funds came largely from charitable donations to SWMC, much of it from a generous resident of the District, as well as charitable donations to the Foundation. (The foundation re-named itself Sonoma West Medical Foundation.) The funds raised amounted to over $8,000,000.

Restarting the Hospital – despite community enthusiasm – was financially difficult. Among other things, insurance program reimbursements lag the provision of medical services, creating a cash flow gap. Even when this challenge was surmounted, however, SWMC under its community-based leadership found it difficult to manage its billings and expenses so as to reach and sustain a break-even financial level.

SWMC therefore reached out to several experienced hospital operators, to experiment with subcontracting management of the Hospital. By July 2016 it had entered into an agreement with a five-year term with Pipeline Health, a Southern California based multi-faceted operator in the health care industry. Pipeline had particular expertise in turn around work with financially distressed hospitals. This agreement, however, had a clause for termination on four months' notice, and after failing to reach and sustain break-even operations, Pipeline chose to discontinue its services to SWMC. The arrangement with Pipeline ended on March 31, 2017. Pipeline found, compared with its Southern California experience, that the Hospital is in a district with a comparatively low population density and small market. These circumstances made it difficult to achieve the scale of services sufficient for profitability.

### G. Detached Territory; Financial Impact

In 2015 some property owners in the District in the "river corridor" area along the course of the Russian River – specifically, in the Forestville, Guerneville, and Monte Rio school districts –

-28-

expressed the view that they do not benefit as much from the existence of the Hospital and other medical services provided by the District as do residents of the rest of the District. For simplicity, we refer to property owners supporting this view as "the Detachers." The Detachers believed that their access to health care services, including ER access, is easier at some facilities operated by other entities. At the same time, the Detachers believed that they therefore pay parcel tax to the District in amounts disproportionate to the benefit that they receive.

Under procedures provided by California local district law, the Detachers filed an application for detachment in April 2016 and circulated a petition seeking to detach the area of the three indicated school districts from the territory, and tax base, of Palm Drive. This petition achieved the minimum number of signatures for consideration. The petition therefore went to the Sonoma County Local Area Formation Commission ("LAFCO"). LAFCO evaluated the petition, and a complex process mandated by the state law of local districts followed. It resulted in approval of the detachment of the affected area.

As a result of this detachment of territory from the District, the detached area is no longer liable for taxation to support repayment of *post-detachment* bonds or other debt issued or incurred by the District. However, detachment did not change the legal obligation of the residents of the detaching area for taxation at existing levels that supports repayment of existing debts of Palm Drive. That includes both its secured bond debts and the obligations to existing creditors represented by the payments required under the Plan.

After discussions between LAFCO and the District, it was determined that $105.74 of the regular parcel tax of $155 goes to support repayment of the debts of the District existing on the detachment date of February 2, 2017. (The amount from the detached area is adjusted annually.) Accordingly, $950,000 of parcel tax revenue from this source is available for the purposes of the Plan as of 2019 and held pending approval of a bankruptcy plan. These funds are reflected in the Plan Projections as "Parcel Tax – Detached territory." (The Detachers do not receive a reduction in their obligation to pay the share of property tax dedicated to service of the debt of the Series 2000 GO Bonds, because that tax is collected in the exact amount needed to service the debt with no surplus for District operations.)

-29-

1    Thus, the successful detachment of the "river corridor" area does not affect feasibility of the

2    Plan.

3    More, recently a group of residents of the District residing in the boundaries of the Bodega

4    Fire District (the Fire District itself has no role in this) have begun circulating a detachment petition.

5    Whether they will obtain sufficient signatures, and a vote in favor of detachment, is unknown at this

6    time.  However, their actions have little financial impact on the Plan for two reasons.  First, there are

7    relatively few parcels in the affected area and therefore a small amount of tax revenue from it.

8    Second, like the "river corridor" group, even if successful this group would remain liable to pay the

9    proportion of their parcel tax that supports the existing, pre-detachment debts of the District.

10    **H. Durall Lab Testing Program**

11    In mid-2017 a different approach for operation of the Hospital was implemented.  SWMC

12    was approached by Aaron Durall and an entity formed by him, Durall Capital Holdings ("DCH"), a

13    company engaged in the lab testing industry.  Utilizing features of a federal hospital laboratory

14    outreach program – which permits smaller rural hospitals to serve as reference labs to achieve higher

15    testing volumes and associated revenue – DCH's business plan involved subcontracted management

16    of the Hospital and its lab, while billing for lab tests at higher hospital-based rates as compared with

17    rates reimbursed to free-standing independent laboratories.  The increased revenues were shared

18    between SWMC and DCH under the contractual arrangements.  Formalized at June 30, 2017, this

19    business plan sharply increased SWMC's monthly operating revenues and allowed SWMC to run in

20    the black for the remainder of 2017.

21    In late 2017, however, Anthem Blue Cross asserted that the SWMC-DCH lab testing

22    arrangement was illegitimate, and that Anthem Blue Cross and its affiliates had been overcharged by

23    $13.5 million through this arrangement.  SWMC and Palm Drive disputed these allegations, insisting

24    that the arrangements complied with all applicable legal requirements and produced revenue gains

25    consistent with the federal program purpose of assisting the long-distressed financial stability of

26    smaller rural hospitals.

27    Initially, although making a demand, Anthem took no legal action against either SWMC or

28    Palm Drive.  Anthem did take legal action against Durall in another state (unrelated to SWMC).

-30-

Perhaps for that reason, DCH ceased sending specimens for testing at the Hospital lab early in 2018. This resulted in SWMC again encountering substantial monthly operating shortfalls. This negative development caused Palm Drive to again explore the future of the Hospital on a more fundamental level, including the possibility of selling the Hospital to an experienced hospital operating company. Further, Anthem filed a lawsuit against SWMC on June 1, 2018, alleging testing fraud and claiming $13.5 million in damages. Importantly, Anthem did not file suit against Palm Drive, and the short deadline by which it could do so – since Palm Drive is a California governmental entity – has expired, on August 24, 2018.

In 2018 a member of Palm Drive's Board of Directors obtained copies of correspondence that he believes implicated some staff and Board members of Palm Drive in discussions for SWMC to pay a demanding Durall and DCH kickbacks illegal under California health care law. Those persons have denied all such allegations, and asserted that they resisted any and all attempts by DCH to receive any more than it was contractually and legally entitled to receive under DCH's lab testing program with SWMC. The alleging board member called his allegations and purported supporting documents to the attention of the Sonoma County District Attorney's office. To date there has been no indication that that office considers the allegations worthy of investigation or charges.

## I. IRS Regulations and SWMC Arrangement; Search for New Directions

Palm Drive learned in 2017 that its shield from losses of the affiliated Hospital entity under the MSSA with SWMC raised an IRS issue. The shield was inconsistent with the rules for the use of facilities financed with tax-exempt debt. Palm Drive was not willing to expose itself to the very large operating losses of SWMC, which was never contemplated and specifically excluded by the SWMC MSSA. Such non-responsibility for the affiliate's debt, however, caused a need to find a new partner sound enough for Palm Drive to expose itself to operational loss, or alternatively to divest itself of ownership of the Hospital and refinance its tax-exempt debt. To explore that latter possibility, Palm Drive issued an RFP (request for proposals) in May 2018. The RFP sought a buyer that would continue operating the facility as an acute care hospital, or at a minimum continue to provide substantial medical services in the facility. Responses to the RFP were due on June 15, 2018.

While the RFP was not formally successful – no formal bids were submitted – it led to informal interest that has had a definite outcome.  Several parties expressed interest in discussions for taking over the role of management of the Hospital, and possibly purchasing the Hospital.  These parties had a variety of perspectives on how to modify Palm Drive's business model to make its long-term continuance as a medical facility sustainable.

Ultimately, the most promising of these concepts was put forward by American Advanced Management Group, Inc. ("AAMG").  The AAMG concept emphasizes operating as a long term acute care hospital ("LTCH"), including as well an urgent care center, elective surgeries, radiology services, standard laboratory services, and other hospital-based medical services.  What is closed is principally the Hospital's emergency room.  In that model the Hospital remains an acute care hospital, but no longer maintains status as a *short term* acute care facility.  The emergency room services were particularly expensive and money losing, a strain on many hospitals especially smaller ones, and are not continued.  An urgent care center – being prepared and expected to be operational approximately January 2019 – is provided for, however, and the great majority of patients presenting at emergency rooms have always actually been medically in the urgent – but not truly emergency – category.

The LTCH concept provides a core of financially viable operational revenue.  There is a need – nationally and in Northern California – for LTCH facilities.  For example, changes to Medicare in recent years have penalized acute care hospitals that do not discharge their patients much more quickly than in the past, and at the same time penalize the acute care hospitals if these quickly-discharged patients are readmitted within a short time frame.  The LTCH model moves into this business arena by accepting patients from short term acute care hospitals who need to move patients out of their care, while still arranging for the level of long term acute care the patient needs for which, e.g., home health aide assistance does not medically suffice.

Palm Drive accordingly, on August 26, 2018, entered into a long-term contract ("AAMG MSA") with AAMG for management of the Hospital.  A copy of the AAMG MSA is attached as Exhibit A.  AAMG will operate the Hospital under the name Sonoma Special Hospital, and has organized Sonoma Specialty Hospital, LLC, for that purpose.  The term of the AAMG MSA is ten

-32-

years. Under the terms of the AAMG MSA, Palm Drive owes AAMG a management fee of $100,000 per month, and is responsible for any operating losses that AAMG may incur. (As discussed in Article XII below, however, Palm Drive is not required – under federal tax law or the MSA – to pay these amounts on a current basis, but may defer them for up to five years from when incurred. AAMG's projection, in Exh. B, therefore does not anticipate payment of the management fee on a current basis.) Palm Drive is now responsible for operating losses of the Hospital, but it is therefore not exposed on a going-forward basis to liability for potential tax penalty for use of the facilities for "private use" when they are supported by tax-exempt bonds/COPs.

At the same time, AAMG is interested in – and in the AAMG MSA has obtained an option for – purchasing the Hospital at the earliest practicable date. Under California law, sale of a public district's health facility requires a vote of the district's residents. Palm Drive will seek to qualify a measure for this vote at the March 2019 County election, if required filing timelines can be met. Sale of the Hospital to AAMG will require Palm Drive to pay off its secured bonded debts (Classes 1, 2, and 3) in full, which it would do with a combination of sale proceeds and refinancing of the debts with taxable bonds.

As the arrangements with AAMG were being finalized, SWMC was exhausting its financial ability to continue operating the Hospital. The District's MSSA with SWMC was terminated, for cause for SWMC's inability to continue to fulfill its contractual operational obligations. An orderly transition of management of the Hospital was arranged, and AAMG assumed operational management on September 9, 2018. AAMG has been operating the Hospital since September 9. In a positive development, AAMG was immediately able to fill sufficient beds and decrease costs at the facility to run at a better than anticipated financial basis even in its first three weeks of operation ending September 30, 2018. Attached as Exhibit B is AAMG's projection of its operations through February 2020 and attached as Exhibit C are the financial results for its actual operations for the period ended September 30, 2018. As shown in these statements AAMG's initial performance shows better results in the short term as well as the long term. The initial period loss, for part-September 2018, was projected at $877,276, while the actual result achieved was a loss of only $104,772.72. The initial projection for break-even on a monthly basis was October 2019. At the

-33-

current rate, however, break-even could occur substantially sooner. There is a reasonable expectation that AAMG's LTCH model will be successful, and achieve sustainable break-even or better results over the long term.

SWMC – being insolvent, having defaulted in Anthem's lawsuit against it, and having no further management role at the Hospital – determined to file for bankruptcy. Its bankruptcy petition was filed on September 26, 2018, under Chapter 7 of the Bankruptcy Code. It is now under the control of a Chapter 7 trustee appointed by the bankruptcy court supervising its case. (The process differs greatly from a Chapter 9 bankruptcy such as Palm Drive's.) Because Palm Drive has never had responsibility for the debts of SWMC, Palm Drive believes that SWMC's bankruptcy likely has no financial relevance to Palm Drive's Plan and exit from bankruptcy.

### J. Palm Drive's Financial Condition and Implementation of Plan Payments

Palm Drive's financial condition in the year that it suspended operation of the Hospital after filing this Bankruptcy Case is shown in its audited financial statements for fiscal year 2014 (ended June 30, 2014), available on Palm Drive's website at http://palmdrivehealthcaredistrict.org/?page_id=246. (Audited financial statements for earlier years may also be found at the District's website.) Those statements, reflecting operating the Hospital to April 28, 2014, showed net operating losses – before unrestricted tax revenues – of $11 million. Tax revenues were insufficient to cover that deficit, contributing to the bankruptcy filing.

After suspending operations, however, Palm Drive's costs naturally came down dramatically. This showed immediately in Palm Drive's audited financial statements for fiscal year 2015 (ended June 30, 2015), available at Palm Drive's website at http://palmdrivehealthcaredistrict.org/wp-content/uploads/2016/04/2015-Financial-Audit.pdf. These statements show that operating expenses for fiscal year 2015 (through June 30, 2015) declined to approximately $5 million compared to approximately $32.5 million for fiscal year 2014 (through June 30, 2014,). This reduction was a result of almost total staff layoffs, cessation of purchase of almost all supplies, and cessation of physician fees and contract labor. There were still significant wind-down costs.

Closure of the Hospital, and – as discussed below – its reopening in October 2015 under arrangements under which Palm Drive was not responsible for operating losses brought and kept

-34-

Palm Drive's operating expenses sharply down in succeeding years. Palm Drive's financial results annually for July 2014 - July 2018 are attached as Exhibit D. These statements show the sharp decline in District outlays after the wind-down period from closure of the Hospital in 2014. The District has – through the various experiments briefly described above – been able to keep the Hospital in operation, while its own outlays have been kept moderate – dramatically so in comparison with its pre-petition experience down to April 2014.

With management of the Hospital contracted to AAMG, and Palm Drive's financial exposure to AAMG capable of deferral for up to five years from dates incurred, Palm Drive is in a sound position to carry out the provisions of the proposed Plan for the benefit of creditors. Palm Drive has been setting aside some funds monthly toward the first year of distributions under the Plan, and funds collected from the Detachers for their share of bankruptcy debts set aside at the County, thus providing a significant amount of starting cash to meet the heavier burdens of the Plan in its first year, and some carryover into future years to cover thin net margins in some of those years.

After paying distributions to Creditors provided under the Plan, Palm Drive will carry out some administrative and program functions independently of the Hospital. Palm Drive is an important source of community health and education programs in its territory.

Taking all of the above factors into account, Palm Drive has prepared projections for the duration of the Plan ("Plan Projections"), i.e., through 2027. These projections – attached as Exhibit E – integrate all sources of revenue to the District, Plan outlays, and District administrative and program expenses. The projections do not include restricted funds that are mandatorily set aside as assurance that the next payments due under bonds will be made, or a special reserve fund required under the terms of the Series 2010 COPs that can be applied only when they are paid off. The projections do not include any payments to AAMG for its management fees or potential operating losses, because of the ability to defer them for up to five years under IRS regulations and the AAMG MSA and the likelihood that such obligations will be settled up at the time of sale of the Hospital.

Further discussion of the financial implementation of the terms of the Plan is provided below in Article XII concerning the feasibility of the Plan, which is a criterion for confirmation under the Bankruptcy Code.

/ / /

/ / /

/ / /

# ARTICLE VI

## DESCRIPTION OF THE PLAN OF ADJUSTMENT OF DEBTS

The creditor claims against Palm Drive have been classified into classes in the Plan. Each class consists of one or more creditors whose claims are of the same type and priority according to bankruptcy law. Each claimant in a particular class with an allowed claim will receive the same treatment as other members of the same class. A description of the classes under the Plan and their treatment under the Plan is described below. The discussion of each class also indicates whether it is impaired or unimpaired for the purposes of bankruptcy law, and its voting rights with respect to the Plan.

As noted above, capitalized terms used in this summary of the Plan have the meanings specified in Article I of the Plan. A capitalized term used in the Plan that is not defined in the Plan shall have the meaning assigned to such term in the Bankruptcy Code, the Bankruptcy Rules, or the California Health & Safety Code, if defined in those sources, unless the context plainly requires otherwise.

# ARTICLE VII

## DESIGNATION OF CLASSES OF CLAIMS AND INTERESTS

The Bankruptcy Code requires that pre-petition claims against the debtor be classified by appropriate categories, and the classes designated in the Plan. The claims against Palm Drive are designated and classified as provided below for purposes of the Plan.

7.1    Class 1:  The Secured Claims of holders of the Series 2000 GO Bonds.

7.2    Class 2:  The Secured Claims of holders of the Series 2005 Revenue Bonds.

7.3    Class 3:  The Secured Claims of holders of the Series 2010 COPs.

7.4    Class 4:  The claims of former employees of Palm Drive that are $10,000 or greater in amount.

7.5    Class 5A:  All General Unsecured Claims of $250,000 or less in amount, including executory contract Rejection Claims, other than claims in Classes 4, 5B, and 6.

-36-

7.6     Class 5B:  All General Unsecured Claims greater than $250,000 in amount, including executory contract Rejection Claims, other than claims in Classes 4, 5A, and 6.

7.7.     Class 6:  Convenience class (holders of general unsecured claims including employee claims that are less than $10,000 in amount).  The Bankruptcy Code permits the designation of a category of smaller claims for administrative convenience.  Typically, this is done so that these smaller claims do not have to be tracked and paid small amounts over a period of years.

7.8     **IMPAIRMENT:**  Classes 4, 5A, 5B, and 6 are impaired under the Plan, and are entitled to vote to accept or reject the Plan.  Claims in Class 1, 2, and 3 are not impaired under the Plan, and do not vote to accept or reject the Plan (and accordingly do not receive a Ballot).

## ARTICLE VIII

## TREATMENT OF UNCLASSIFIED CLAIMS

Allowed Claims that are unclassified pursuant to Section 1123(a)(1) of the Bankruptcy Code will be treated as follows:

8.1     Allowed Administrative Claims:  Except to the extent that the holder of an Allowed Administrative Claim has agreed in writing to different treatment of such claim or the Bankruptcy Court orders disbursement at another time, the holder of an Allowed Administrative Claim will receive cash in the allowed amount of such claim within thirty (30) calendar days after the Administrative Claims Bar Date, or, if such Administrative Claim becomes an Allowed Administrative Claim at a later date, then not later than twenty-one (21) calendar days after the date an order allowing such Administrative Claim becomes a Final Order.  An Administrative Claims Bar Date will be set in reasonable relation to the timing of the Effective Date of the Plan.  Allowed Administrative Claims include timely-filed and allowed Section 503(b)(9) Claims.  Notwithstanding the foregoing, any Administrative Claim incurred in the ordinary course of Palm Drive's activities post-petition (including without limitation any claim of an employee or contract laborer for post-petition compensation and benefits) shall be paid in the ordinary course in accordance with the existing terms for such obligation.

8.2     Professional Fees of the Debtor and Committees:  Under the Plan, attorneys' fees and expenses incurred by Palm Drive "in the case or incident to the Plan," and the Official Committee of

-37-

Unsecured Creditors will be paid, up to a maximum of $50,000 for the Committee, and if – after submission by Palm Drive and the Committee – approved as reasonable by the Bankruptcy Court under Bankruptcy Code § 943(b)(3), within twenty-one (21) days of an order of the Bankruptcy Court granting such approval. A hearing on such approval should be held within 30 days of Confirmation. Attorneys' fees and expenses incurred by the Official Committee of Employees will not be paid by Palm Drive, under the Plan or otherwise.

## ARTICLE IX

## TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS

The classified claims and interests designated in Article II of the Plan will receive the following treatment. Classes 4, 5A, 5B, and 6 are impaired under the Plan. Classes 1, 2, and 3 are not impaired under the Plan.

9.1     Class 1 Claims — Secured Claims of Series 2000 GO Bonds: The holders of allowed Secured Claims of the Series 2000 GO Bonds shall retain, unaltered, the legal, equitable, and contractual rights to which such claim is entitled according to the existing terms thereof. These claims will be paid according to their existing pre-bankruptcy terms and payment schedule.

The Series 2000 GO Bonds are secured by a percentage of property tax collected annually on real property located within the District, a percentage that is set as equal to the debt service on these Bonds. These Bonds will therefore be paid in full, and will not be "impaired" as that term is defined in bankruptcy law.

If the Hospital is sold prior to pay off in the ordinary course of the Series 2000 GO Bonds, they will be paid off from sale proceeds and – to the extent necessary – proceeds of refinancing with taxable bonds.

9.2     Class 2 Claims — Secured Claims of Series 2005 Revenue Bonds. The holders of allowed Secured Claims of the Series 2005 Revenue Bonds shall retain, unaltered, the legal, equitable, and contractual rights to which such claim is entitled according to the existing terms thereof. The Series 2005 Revenue Bonds are secured by the parcel tax levied annually on property within the district (and that portion of parcel tax levied on the Detached Parcels), which is more than

-38-

sufficient to cover the debt service on these Bonds. These Bonds will therefore be paid in full, and will not be "impaired" as that term is defined in bankruptcy law.

If the Hospital is sold prior to pay off in the ordinary course of the Series 2005 Revenue Bonds, they will be paid off from sale proceeds and – to the extent necessary – proceeds of refinancing with taxable bonds.

9.3     Class 3 Claims – Secured Claims of Series 2010 COPs.  The holders of allowed Secured Claims of the Series 2010 COPs shall retain, unaltered, the legal, equitable, and contractual rights to which such claim is entitled according to the existing terms thereof.  The Series 2010 COPs are secured by the parcel tax levied annually on property within the district (and that portion of parcel tax levied on the Detached Parcels), which is more than sufficient to cover the debt service on these COPs.  These COPs will therefore be paid in full, and will not be "impaired" as that term is defined in bankruptcy law.

If the Hospital is sold prior to pay off in the ordinary course of the Series 2010 COPs, they will be paid off from sale proceeds and – to the extent necessary – proceeds of refinancing with taxable bonds.

9.4     Class 4 – Former Employees.  Allowed claims of former employees (unless they fall into, or choose to opt into, Class 6 below) will receive sixty percent (60%) distribution on their claims, payable in two equal installments.  The first installment will be paid six months from the Effective Date.  The second installment will be paid 12 months from the Effective Date.

Claims of former employees of the District do not under the Bankruptcy Code enjoy priority in a Chapter 9 case.  The District nevertheless recognizes the distinctive contribution made by the former employees to the health and welfare of the residents of the District, and the high patient care and safety record achieved by Palm Drive Hospital prior to the suspension of its operation in its financial difficulties.  As individuals, their financial needs are also inherently different and more pressing than for businesses.  The District also desires to incentivize these former employees, where feasible, to consider returning to employment at the Hospital.  These creditors therefore receive a somewhat higher percentage distribution, and earlier distribution, than some other creditors under the Plan.

-39-

This category of claims includes the WARN Act claims that some of the former employees have. (Like unpaid wages, WARN Act amounts do not enjoy any priority of treatment under Chapter 9.)

As required by applicable law, Palm Drive will comply with all federal, state, and local withholding and reporting requirements with respect to distributions on employee claims.

The projected total payout on claims of former employees is approximately $424,000. This figure could be lower if there are claims that are found to be subject to valid objections.

9.5    Class 5A – General Unsecured Claims of $250,000 or Less. Allowed General Unsecured Claims of $250,000 or less, including executory contract Rejection Claims other than claims in Classes 4, 5B, and 6, will receive distribution of fifty percent (50%) of the amount of their claims, paid in three installments, with the first installment 90 days from the Effective Date and the subsequent installments in the first and second years from the year of the Effective Date.

This class of claims includes trade vendors, claims relating to rejected contracts, claims of providers of professional services on contract rather than as employees, etc. – the most general category of claims, but designated for those in this category of $250,000 or less in amount. This class of claims is unsecured, and has no claim on the tax revenues of the District.

These comparatively smaller claims are typically held by smaller businesses. Their need for a distribution on their claims is more immediate than that of large businesses. It is for this reason that the payments on these claims are made in a shorter time frame than for Class 5B below. As a trade-off for the relatively quicker payment schedule, these claims receive a smaller percentage distribution than the large business claims in Class 5B, who wait considerably longer for completion of the larger distributions they will receive.

The projected total payout on Class 5A General Unsecured Claims is approximately $1,565,000. This figure could be lower if there are claims that are found to be subject to valid objections.

9.6    Class 5B – Allowed General Unsecured Claims of more than $250,000. Allowed General Unsecured Claims of more than $250,000, including executory contract Rejection Claims other than claims in Classes 4, 5A, and 6, will receive distribution of seventy-five percent (75%) of

-40-

the amount of their claims, paid in seven annual equal installments, with the first installment paid in the second year after the Effective Date of the Plan and the subsequent six installments paid in the succeeding years from the Effective Date of the Plan. The first installment will be such as to fit within a total payout in that year of $700,000 to all classes of unsecured creditors. The subsequent installments will be equal in amount and sufficient to bring the total distribution to the target 75%.

This class of claims also includes trade vendors, claims relating to rejected contracts, claims of providers of professional services on contract rather than as employees, etc. – the most general category of claims, but is designated for those in this category with claims greater than $250,000. This class of claims is unsecured, and has no claim on the tax revenues of the District.

These comparatively larger claims are typically held by larger businesses. Their need for a distribution on their claims is less immediate than that of smaller businesses. It is for this reason that the payments on these claims are made over a period of several years, rather than the shorter time frame for Class 5A above. As a trade-off for the longer payment schedule, these claims receive a larger percentage distribution than the smaller business claims in Class 5A, who wait a considerably shorter time for completion of the distributions they will receive.

The projected total payout on Class 5B General Unsecured Claims is approximately $4,000,000. This figure could be lower if there are claims that are found to be subject to valid objections.

9.7    <u>Class 6 – Convenience Class</u>. Holders of allowed General Unsecured Claims that are less than $10,000 in amount (including employee claims) will receive distribution of forty percent (40%) of the amount of these claims 90 days after the Effective Date. Creditors in Classes 4 and 5A who have claims larger than the Convenience Class amount may, at their option, reduce their claim to the Convenience Class amount and receive the 40 percent distribution in the same manner, and at the same time, as other members of the Convenience Class.

A single, early payment on claims this small in amount (of which there is a sizable number) is provided because payment over time would be an undue administrative burdensome to the District to track and pay these small amounts.

The District estimates that significant numbers of trade claims that are comparatively small in dollar amount will exercise the option to opt into the convenience class. This will result in a modestly higher financial burden to make early payment of the distribution to this class, but further reduce the number of claims that must be tracked over time for installment distributions, with accompanying reduction in administrative burden.

The projected total payout on Convenience Class claims is approximately $499,000. This figure will likely increase for claims that may "opt-down" from Classes 4 and 5A into this class. This figure could be lower if there are claims that are found to be subject to valid objections.

## ARTICLE X

## EXECUTORY CONTRACTS

Palm Drive's executory contracts and unexpired leases are treated as follows:

10.1    All pre-petition executory contracts or leases not previously assumed or rejected, or otherwise dealt with by Bankruptcy Court order, will be rejected as of the Effective Date of Plan. The provisions of this subsection of the Plan shall not affect any prior order(s) of the Bankruptcy Court approving assumption or rejection of any specific contracts or leases, or the disposition of any motion to assume or reject executory contracts or leases which motion is filed and served not later than the hearing on Confirmation of the Plan. More than 200 executory contracts of Palm Drive have been rejected with previous orders of the Bankruptcy Court. Palm Drive believes that, as a result of Palm Drive's suspension of Hospital operations in 2014-15, all pre-petition executory contracts and leases have either been rejected by previous orders of the Bankruptcy Court or expired by their terms. Provision is made for the possibility of rejecting any other executory contract out of an abundance of caution, for the sake of completeness.

10.2    Rejection Claims are classified as Class 5A or 5B claims, depending on whether they are $250,000 or less, or higher than $250,000. Any Rejection Claim which becomes an Allowed Claim will receive the treatment provided for claims in Class 5A and 5B as applicable. Within thirty (30) days following service of notice of the Effective Date of the Plan, any party asserting a Rejection Claim with respect to any executory contract or lease rejected pursuant to Section 5.1 above, and which has not already filed a Rejection Claim, must file with the Bankruptcy Court, and

-42-

serve on counsel for Palm Drive, a proof of claim and documentation supporting such Rejection Claim, or be forever barred from asserting any such claim or receiving any payment on account of such claim.

## ARTICLE XI

### MEANS OF IMPLEMENTATION OF THE PLAN

The Plan will be implemented as follows:

11.1 <u>Continued Governance of Palm Drive; Palm Drive Property and Revenues</u>

(a)     As of and after the Effective Date, the duly elected Palm Drive Board of Directors, as constituted from time to time, will continue to govern the Palm Drive Health Care District. Palm Drive will administer, control, manage, and operate the property and revenues of the District in accordance with the Plan, the District's governing documents, applicable California law, and other applicable laws.

(b)     Palm Drive will continue to receive those tax revenues collectible from residents of the District for its benefit pursuant to laws and official measures in effect as of the Petition Date, subject to the debt service obligations to which portions of such revenues are dedicated, and as modified by the treatment required by law for proportional collection from the Detachers..

(c)     Palm Drive will exercise control and oversight over the Hospital through the MSA with AAMG (or any successor). The Hospital Governing Board established under the MSA, a subcommittee of Palm Drive's Board of Directors, is the mechanism through which Palm Drive will exercise its oversight of Hospital operations. These governance arrangements are consistent with California law for local health care districts.

(d)     The District and AAMG contemplate that the District will sell the Hospital to AAMG. (Under state law, the sale price must be not less than the fair market value of the Hospital assets, as determined by an independent appraisal, which is being obtained.) Such a sale must be approved by the voters of the District. Also, sale of the Hospital to AAMG would – under tax-exempt bond law – trigger a requirement for the District to pay off its bond and COPS debts. This

-43-

1  would be accomplished through refinancing those debts, which is feasible on the collateral of the tax

2  revenues of the District.

3  (e) Meanwhile AAMG will provide front line operational management of the

4  Hospital, including its operating revenues and expenses. AAMG also provides capital expenditures

5  as needed to maintain the Hospital facilities. As required by the rules applicable to tax-exempt bond

6  supported facilities, and the MSA as to AAMG's contractual management fee, Palm Drive will have

7  liability for any operating losses incurred by the Hospital, and the management fee. Unless and until

8  a sale of the Hospital is brought before the voters of the District and approved, Palm Drive's

9  facilities will continue to be owned by the District, and AAMG has only operational arrangements

10  with respect to them. Creditors should be clear, however, that under federal tax-exempt bond law,

11  and the MSA, Palm Drive has the ability to defer reimbursement of AAMG for losses and

12  management fees, for up to five years. The five years is a rolling period, calculated from the date

13  when the operating losses and management fees are incurred. Further, the District's obligation is

14  reduced to the extent that AAMG recoups losses – which may occur in the early period of its

15  operation – by net positives on operations in subsequent periods. It is the District's intent that prior

16  to the time when the District would have to reimburse AAMG, the District will sell the Hospital to

17  AAMG – in 2019 if possible. At that time, the District can deal with any net obligation to AAMG in

18  terms of the sale price and possibly within the refinancing of the District's secured bond and COPs

19  debt that the sale of the Hospital necessitates under tax-exempt law.

20  These arrangements allow the District to deal with its Plan obligations, maintain the

21  provision of substantial medical services to the community, and provide for continued operation of

22  the Hospital for the benefit of the community (with many medical services even though not a full

23  emergency room department) even after the District discontinues its own ownership and operation of

24  the Hospital. This result achieves a long-sought but often frustrated goal of the District –

25  continuance of the Hospital without the financial losses that operation by the District itself so long

26  encountered.

27  (f) In addition to operating – through AAMG – the Hospital, Palm Drive will

28  continue to engage in community-based health services. Palm Drive may do so directly through

-44-

programs of its own, or indirectly through cooperation with and financial support for other agencies and entities active in Palm Drive's territory. Such community-based health services are an important part of Palm Drive's mission. If the Hospital is sold, the District can operate as a Community Based Health Care District, which 22 of the 79 California local health care districts do.

11.2     Payment of Administrative and Priority Claims:  From cash on hand at the Effective Date, Palm Drive will pay all payments under this Plan required to be made on or in connection with the Effective Date, including:

(a)  All Allowed Administrative Claims required to be paid on or in connection with the Effective Date, unless the holder of any such claim agrees in writing to a later payment date. Palm Drive will pay any subsequently allowed Administrative Claims in full promptly after a Final Order allowing such claim, unless otherwise agreed in writing by the holder of any such claim.

(b)  Allowed Priority Claims, including allowed 503(b)(9) Claims, required to be paid on or in connection with the Effective Date.  Palm Drive believes that there are no Priority Claims, other than a small number of 503(b)(9) Claims in which the creditor did not receive return of its goods supplied within the applicable – quite brief – Section 503(b) (9) time frame.

11.3     Payment of Distributions on Classified Claims:  In its annual budget process, and any supplemental budgeting decisions as may be necessary, Palm Drive will provide for payment of the distributions to the classes of claims provided under Article IV of the Plan, according to the treatment of those classes as provided there.  In making such distributions, Palm Drive will make appropriate calculations, and provide for appropriate reserves in the Disputed Claims Reserve Account as described in Section 11.12 below.  Palm Drive will act as disbursing agent under the Plan with regard to all payments and distributions to be made to creditors or other parties in interest hereunder, without bond.

11.4     Objections to Claims:  Palm Drive is authorized to review and object to claims. Subject to making the payments required by Article IV of the Plan, and the funding of the reserve required by Section 6.11(d) of the Plan, Palm Drive is authorized to enter into compromises to allow and satisfy Disputed Claims, and to sell, liquidate, or abandon any claim or cause of action of Palm Drive against any third party.

-45-

11.5 **Post-Confirmation Powers of Palm Drive:** Subject to the other express provisions of the Plan, Palm Drive:

(a) is authorized to determine whether Palm Drive will pursue any claims or causes of action available under applicable law (including Avoiding Actions); and

(b) if it determines that any such claim or cause of action should be pursued, to commence, prosecute, or compromise such claim. Any recovery on such claim or cause of action will be considered property of Palm Drive, and treated as are other assets under the terms of the Plan.

11.6 **Post-Confirmation Reporting**

(a) Annually, Palm Drive will file with the Bankruptcy Court a post-confirmation status report ("Report"), the purpose of which is to explain the progress made toward full administration of the confirmed plan of reorganization. The first Report will be filed for the portion of the calendar year from the date of confirmation to the end of the period. Subsequent reports will be filed attar the end of each calendar year thereafter until entry of a final decree closing the Chapter 9 Case. Reports will be filed with the Bankruptcy Court not later than forty-five (45) days after the expiration of the reporting period. Consistent with the bankruptcy law concept of "substantial consummation" of a bankruptcy plan, closing of the case is expected to occur long before the last payments under the Plan are made.

(b) The Report will include a statement of receipts and disbursements, with the ending cash balance, for the reporting period. The Report will also include information sufficiently comprehensive to enable the Bankruptcy Court to determine: (1) whether the order confirming the Plan has become final; (2) whether payments under the Plan have commenced; (3) whether payments required under the Plan are current; and (4) whether all motions, contested matters, claim objections, and adversary proceedings have been finally resolved.

(c) A copy of each Report will be served promptly on such persons or entities as have made a request for service of such Reports in writing with the Bankruptcy Court ("Post-Confirmation Notice List"), with copy of such request served on Palm Drive and its counsel not later than the day on which it is filed with the Bankruptcy Court.

-46-

(d)  At such time as Palm Drive deems appropriate, consistent with applicable law and rules, Palm Drive will file an application for entry of a final decree in this Bankruptcy Case, and will serve the application on the Post-Confirmation Notice List, together with a proposed final decree.  Palm Drive will prepare and file any status report that may be required by the Bankruptcy Court in connection with the issuance of a final decree.  Those parties on the Post-Confirmation Notice List will have twenty-one (21) days within which to object or otherwise comment upon application to the Bankruptcy Court for entry of the final decree.

11.7    Other Post-Confirmation Powers:  Palm Drive is authorized to do or cause to be done all things necessary and appropriate to administer and execute the Plan, consistent with the terms of the Plan, the Confirmation Order, and the Bankruptcy Code and the Bankruptcy Rules to the extent applicable.  Palm Drive will have full power and authority to execute and deliver any and all documents necessary or appropriate to carry out the Plan.

11.8    Release of Officers and Directors of Palm Drive:  In the Plan, on the Effective Date, Palm Drive releases any and all claims, rights, and causes of action that it may hold against any officer or director who is now serving, or who has served during the Bankruptcy Case, arising as a result of any action taken or omitted to be taken by any such person in connection with or related to the solicitation of votes on the Plan, the confirmation of the Plan, or any action otherwise within the scope of the duties and powers of such person in the governance of the District, whether granted under the Bankruptcy Code, under applicable court order, or otherwise, except to the extent that such claims or causes of action arise as a result of gross neglect or willful misconduct by such person in the performance of his or her duties to the District.

11.9    Creditors' Committees:  On the Effective Date, the Official Committee of Unsecured Creditors and the Official Committee of Employees will be dissolved.  Post-confirmation, the former members of these committees and their counsel ("Committee Releasees") will enjoy all defenses and immunities available under the Bankruptcy Code.  Palm Drive will release any and all claims, rights, and causes of action that it may hold against the Committee Releasees arising as a result of any action taken or omitted to be taken by a Committee Releasee solely in connection with or related to (a) the solicitation of votes on the Plan, (b) the confirmation of the Plan, or (c) any action otherwise

-47-

within the scope of the duties and powers of the Committee or any Committee member, whether granted under the Bankruptcy Code, under applicable court order, or otherwise, except to the extent that such claims or causes of action arise as a result of willful misconduct a Committee Releasee acting as such, as the case may be. Notwithstanding the foregoing, the provisions of this subsection are not intended to, and shall have no effect on, the allowability (or lack thereof) of any creditor claim held by any member of a Committee, or the status or result of any objection to such creditor claim held by any member of a Committee.

11.10 <u>Avoiding Actions</u>: All Avoiding Actions (if any remain available) are preserved after the Effective Date, and may be prosecuted post-confirmation by Palm Drive, subject to the following provisions:

(a) Except as otherwise provided in paragraph (b) below, any action to recover on an Avoiding Action must be commenced in a court of competent jurisdiction not later than six (6) months after the Effective Date, or it will be barred.

(b) The deadline set forth in paragraph (a) above for commencing an action may be extended by:

(1) Written agreement of the proposed defendant; or

(2) Order of the Bankruptcy Court, made on a showing of good cause after motion served before the expiration of the deadline (including any previously extended deadline) on the proposed defendant; <u>provided</u>, that in the event the Bankruptcy Court denies any timely brought motion to extend the deadline, the deadline shall nevertheless be extended until fourteen (14) calendar days after the date of entry of the order denying the requested extension.

11.11 <u>Unclaimed Property</u>: If a distribution to the holder of an Allowed Claim remains unclaimed for forty-five (45) days following the attempted distribution, Palm Drive shall use reasonable diligence to attempt to locate such claim holder. If after reasonable diligence, such claim holder still cannot be located, such distribution shall be conclusively deemed waived by the holder of the claim.

-48-

11.12 <u>Disputed Claims</u>:

(a) Except as otherwise provided in paragraph (b) immediately below, any objection to claims will be filed no later than ninety (90) days after the Effective Date.

(b) The deadline set forth in paragraph (a) above for objecting to any claim may be extended by:

(1) Written agreement of the holder of the claim; or

(2) Order of the Bankruptcy Court, made on a showing of good cause after motion served before the expiration of the deadline (including any previously extended deadline) on the holder of the claim; <u>provided</u>, that in the event the Bankruptcy Court denies any timely brought motion to extend the deadline, the deadline shall nevertheless be extended until fourteen (14) calendar days after the date of entry of the order denying the requested extension.

(c) Notwithstanding any other provisions of this Plan, the disputed portion of a Disputed Claim shall not receive any distribution, unless and until the status of an Allowed Claim is attained for such disputed amount.

(d) Palm Drive will maintain and administer, on its books and records, a non-segregated Disputed Claims Reserve Account, subject to the following provisions:

(1) In the event that a claim is disputed and has not become an Allowed Claim as of the date of any distribution to creditors, an amount of cash sufficient to pay the applicable distribution to the Disputed Claim if allowed in the full amount for which it is asserted shall be placed in the Disputed Claims Reserve Account.

(2) If and when a Disputed Claim becomes an Allowed Claim by entry of a Final Order so ruling, the appropriate portion of the funds placed in the Disputed Claims Reserve Account with respect to such claim shall be paid to the holder of the Disputed Claim as soon as practicable thereafter.

(3) Funds attributable to the disallowed portion of Disputed Claims which are disallowed in whole or in part by a Final Order shall be released from the Disputed Claims Reserve Account.

(4) The Final Order which either allows or disallows a Disputed Claim shall also specify and order the amounts that are to be disbursed from the Disputed Claims Reserve Account.

11.13 <u>Administrative Claims Bar Date; Professional Fees</u>: Except as otherwise provided in paragraphs (a) and (b) immediately below, requests for payment of all Administrative Claims which are due on or in connection with Confirmation, and any Professional Fees Claim for professional fees of Committees or any third party, must be filed with the Bankruptcy Court and served on Palm Drive not later than thirty (30) calendar days following Confirmation, or be forever barred and Palm Drive will then not have any further liability therefor.

(a) The bar date for filing a request for payment of an Administrative Claim or Professional Fees Claim may be extended by written agreement between the claimant and Palm Drive, or by Bankruptcy Court order by request for good cause, on notice to Palm Drive, filed and served prior to the bar date.

(b) The Effective Date will not occur until the Court has ruled on the reasonableness of Professional Fees under Section 943(b) of the Bankruptcy Code.

(c) The bar date established in Section 6.12 of the Plan does not apply to post-petition ordinary trade payables or other obligations incurred in the ordinary course of Palm Drive's post-petition activities, which claims will, pursuant to Section 3.1 of the Plan, be payable in the ordinary course in accordance with the existing terms otherwise applicable to such obligations.

11.14 <u>Preservation of Claims and Objections</u>: Nothing in the Plan is intended to, nor will it, limit in any way the ability of Palm Drive to:

(a) exercise the rights and powers conferred upon it by applicable bankruptcy law, including but not limited to the pursuit of Avoiding Actions and the prosecution of objections to claims (whether or not their holders have accepted the Plan),

(b) pursue recovery on any and all other claims or causes of action held by Palm Drive prior to Confirmation under otherwise applicable non-bankruptcy laws, or

(c) exercise the rights and powers of governance and take other official actions through Palm Drive's Board of Directors and officers; provided that all such powers and actions are

-50-

exercised in all respects in compliance with the provisions of the Plan and the Confirmation Order, and provided further that no claims, causes of action, rights, avoiding powers, other powers of Palm Drive, or objections to any claims against Palm Drive whatsoever are released, waived, deemed adjudicated, or allowed by confirmation of the Plan except as expressly provided in the Plan or the Confirmation Order.

**ARTICLE XII**

**FEASIBILITY OF THE PLAN**

Distributions proposed under the Plan will be made to the various classes of creditors according to the treatment provided for them in Article IX above. The ability to make these distributions is shown in the Plan Projections (Exhibit E to this Disclosure Statement). These projections in part reflect Palm Drive's restructured governance and operational model, with management by AAMG under the new LTCH medical services model. The Plan also benefits from the ability to defer any accrued liability to AAMG for up to five years from the date incurred.

The Plan relies on the assured source of funding provided by the District's parcel tax, which provides gross revenues of approximately $3.6 million annually. The District has also set aside funds dedicated to the implementation of the Plan in the amount of $791,000 (including $300,000 held by the County collected from the Detachers as their proportional share of bankruptcy debts), to augment the regular parcel tax income that will be received in 2019, to assist in meeting the Plan obligations near in time to the occurrence of the Effective Date.

Thus, in the first year of the Plan (2019), payments to secured debt holders amount to approximately $2,000,000 and payments to classes of unsecured claims amount to approximately $1,265,000. (This is feasible only because of the cash on hand, and amounts that Palm Drive has set aside in anticipation of Plan distributions.) In the second year of the Plan (2020), payments to secured debt holders again amount to approximately $2,000,000 and payments to classes of unsecured claims amount to approximately $700,000. The amount for unsecureds is lower in that year than the first year because much of the initial available cash was consumed by distributions in the first year. At that point in the process, smaller creditors – including the class of former employees and convenience class creditors – have received the full amount of the distribution

-51-

provided for them. As noted above, in return for early distribution on their claims, these classes receive a lower percentage distribution than larger claims that wait longer.

The Plan Projections illustrate that the District's Plan provides as favorable a treatment of its creditors as is reasonably possible without jeopardizing its public service mission of providing medical services to residents of the District. The management arrangement with AAMG, with its ten year life span, is a stable basis for carrying out these balanced objectives. While achieving these goals, the Plan also contemplates the hoped-for possibility that the Hospital will eventually be sold to AAMG, placing the Hospital in a favorable position to continue in the long term as a source of a wide range of valuable medical services to the residents of the District.

The Plan is feasible, and makes an equitable allocation of the District's available resources between creditor recoveries and its public purpose of providing medical services to residents of the District.

## ARTICLE XIII

## INJUNCTION AND CUSTODIA LEGIS

13.1     Confirmation of the Plan will constitute an injunction prohibiting any person from taking any act, commencing any suit, or enforcing any right, including the right to a judicial or non-judicial foreclosure of any lien, which has the effect of asserting, liquidating, or enforcing any claim provided for in the Plan against any property or revenues of Palm Drive, and prohibiting any person from taking any act, commencing any suit, or enforcing any right which has the effect of asserting, liquidating, or enforcing any claim provided for in the Plan against Palm Drive except as provided by the provisions of the Plan.

13.2     All of the property of Palm Drive shall be retained by Palm Drive as of and from the Effective Date, free and clear of all claims and interests of creditors, subject to the provisions of the Plan, and shall be under the control and direction of, and shall be administered by, Palm Drive.

13.3     Entry of the Confirmation Order acts as a discharge of any debt of Palm Drive that arose prior to Confirmation to the extent provided under Section 944(b) of the Bankruptcy Code. Neither Palm Drive nor its Board of Directors or officers shall have any liability to any creditors other than to make the distributions expressly provided for under the Plan.

-52-

**ARTICLE XIV**

**RETAINED JURISDICTION**

After Confirmation, the Bankruptcy Court will retain jurisdiction pursuant to Section 945 of the Bankruptcy Code and the Plan to enforce the provisions, purposes, and intent of the Plan or any modification thereof, including without limitation, matters or proceedings relating to:

14.1    Allowance, disallowance, reconsideration, estimation, compromise, settlement, adjustment, treatment, or liquidation of claims and objections thereto;

14.2    Allowance of claims and requests for payment of administrative expenses of the Debtor;

14.3    Review and determination of the reasonableness of professional fees incurred by Palm Drive, and of Professional Fee Claims of the Committees up to the cap limits provided by the Plan, "in the case or incident to the Plan" as provided by Bankruptcy Code § 943(b)(3);

14.4    Resolution of controversies and disputes, including disputes regarding interpretation of the Plan and the Confirmation Order, and the correction of any mistake, defect, or omission regarding interpretation or enforcement of the Plan and the Confirmation Order;

14.5    Modification(s) of the Plan pursuant to Section 1127(d) or Section 942 of the Bankruptcy Code;

14.6    Adjudication of any actions brought post-confirmation by Palm Drive to enforce any right or recover any claim created, granted, or preserved under the Plan;

14.7    Entry of orders in aid of implementation of the Plan;

14.8    Such other matters for which jurisdiction is provided under the Bankruptcy Code, the Plan, or the Confirmation Order; and

14.9    Entry of a final decree closing the Bankruptcy Case.

**ARTICLE XV**

**EFFECT OF CONFIRMATION OF THE PLAN**

Upon Confirmation, pursuant to Section 944(a) of the Bankruptcy Code, the provisions of the Plan will be binding upon Palm Drive, any person or entity acquiring property under the Plan, and

-53-

any creditor, whether or not the claim of such creditor is impaired under the Plan and whether or not such creditor has accepted the Plan.

## ARTICLE XVI

## NON-SUBSTANTIVE MODIFICATION OF PLAN

Palm Drive may, after such notice as the Bankruptcy Court determines to be appropriate, modify the Plan prior to the Effective Date, if the Bankruptcy Court determines that such modification does not materially and adversely affect or impair the interest of any holder of a claim who has not accepted such modification. Such modification shall be deemed accepted by all holders of claims or interests who have previously accepted the Plan.

## ARTICLE XVII

## ALTERNATIVES TO THE PLAN

Under the Bankruptcy Code, in a Chapter 9 case the Bankruptcy Court either confirms a plan of adjustment of debts, either as initially presented or as amended to make it satisfactory to the Bankruptcy Court, or – if no acceptable plan is presented and approved – must dismiss the case. For federalism reasons, neither a conversion of a Chapter 9 case to a liquidation case under Chapter 7 of the Bankruptcy Code, nor appointment of a trustee to manage the affairs of the debtor and its debts, are available options for the Bankruptcy Court.

If, then, this Chapter 9 Case were dismissed, Palm Drive would be placed essentially back into a similar position as at the time of the filing of its Petition commencing this Bankruptcy Case. Its creditors would be free to pursue collection of their claims against Palm Drive, with no automatic stay such as Palm Drive has been protected by in the Bankruptcy Case.

Palm Drive might attempt to negotiate separate payment arrangements with each of its several hundred creditors. Palm Drive has no reason to believe, and does not believe, that such a fragmented process would be successful. More likely is that various creditors, particularly those holding larger claims, would commence collection litigation. Such litigation would be time-consuming, expensive, and in many instances unsuccessful for Palm Drive. A litigation free-for-all would also be harmful for Palm Drive's smaller creditors, perhaps particularly its former employees,

-54-

who would not have the resources to pursue their claims effectively or in a time-efficient manner and perhaps not at all as a practical matter.

Another possibility is that Palm Drive could file a new Chapter 9 case, and attempt a new plan process with different provisions for treatment of creditors than the present Plan. Palm Drive believes that it is unlikely that there would be such an effort at a new bankruptcy case, given that it would be Palm Drive's third trip through bankruptcy court in less than ten years. It is unlikely that Palm Drive's Board of Directors would pursue that unpromising course of action.

As a technical matter, if Palm Drive's current bankruptcy case were dismissed, and arrangements with all of its creditors could not be reached, the Board of Directors could seek to dissolve the District under California state law. Under state law, upon dissolution, the assets of the District would be transferred to another local government entity, but only one which would concurrently accept the obligation of all of Palm Drive's debts as well. Palm Drive believes that there is no other local public agency that would accept both Palm Drive's assets *and* all of its financial obligations. Palm Drive therefore views this purely technical option as illusory.

Palm Drive believes that the Plan, as currently proposed, far better serves the interests of creditors than any reasonably possible alternative in the setting of this Chapter 9 Case.

[ Remainder of Page Intentionally Blank ]

-55-

**ARTICLE XVII**

**CRAMDOWN REQUESTED**

Palm Drive requests that, if a class of impaired claims does not accept the Plan by the requisite majorities, confirmation nevertheless proceed under Section 1129(b) of the Bankruptcy Code.

DATED: November 19, 2018

PALM DRIVE HEALTH CARE DISTRICT
Debtor

By: _____/s/ Dennis Colthurst_____
　　　Dennis Colthurst
　　　President of the Board of Directors

FOX ROTHSCHILD LLP


By: _____/s/ Dale L. Bratton_____
　　　Michael A. Sweet
　　　Dale L. Bratton
　　　Attorneys for Debtor,
　　　Palm Drive Health Care District

-56-